UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

STATE OF NEW YORK; DAVID A. PATERSON,
in his capacity as Governor of the State of New York;
ANDREW M. CUOMO, in his capacity as Attorney
General of the State of New York; MADISON
COUNTY, NEW YORK; and ONEIDA COUNTY,
NEW YORK,

                         Plaintiffs,                                    **COMPLAINT**

        – against –

DIRK KEMPTHORNE, Secretary, United States
Department of the Interior; JAMES E. CASON,
Associate Deputy Secretary of the Interior; P. LYNN
SCARLETT, Deputy Secretary of the Interior;
FRANKLIN KEEL, Eastern Regional Director,
Bureau of Indian Affairs,

                         Defendants.
_____

## NATURE OF THE ACTION

        1.        This action is brought to overturn the extraordinary and unlawful decision of the

Secretary of Interior (the "Secretary") to take into trust for the Oneida Indian Nation of New York (the

"OIN") 13,003.89 acres of land scattered over a two-county area in Central New York (the

"Determination") which Determination was set forth in a Record of Decision (the "ROD") issued on

behalf of the Secretary on May 20, 2008.  The purpose of this unprecedented decision is to remove

forever the land currently held in fee simple by the OIN from the tax and regulatory jurisdiction of the

State of New York (the "State" or "New York"), the Counties of Madison and Oneida, New York

(together, the "Counties") and numerous cities, towns and villages in which the land is located.  The Determination, if sustained, will fundamentally and permanently alter the character and governance structure of the affected areas and adversely and irreparably impact the financial stability of those communities.

2.      The Determination is unauthorized by law.  The statutory provision relied upon by the Secretary – the so-called land into trust section of the Indian Reorganization Act ("IRA") of 1934 – 25 U.S.C. § 465 ("Section 465") – contains no standard whatsoever to govern the Secretary's decision and is an impermissible and unconstitutional delegation of Congressional power.  That provision is, in any event, not applicable to the OIN which, as contemplated by the IRA, long ago elected to reject the provisions of the IRA.  Having done so, the tribe cannot move or make use of Section 465.   The Determination is also arbitrary and capricious, an abuse of discretion, in excess of the Secretary's statutory authority, and otherwise not in accordance with law.

3.      The Determination, and the process by which it was reached, reveal the errors that result, and the rights that are unfairly compromised, when an administrative agency unfettered by legislatively defined standards is authorized to remove land in populated areas long governed by state and local governments from the jurisdiction of those authorities without any legislatively defined standards.

4.      From the outset, the handling of the OIN land into trust application by the Department of the Interior (the "DOI" or "Department"), including its Bureau of Indian Affairs (the "BIA"), has been heavily biased in favor of the OIN.  The Department entrusted the OIN with the selection of an outside

vendor to prepare an environmental impact statement and creating part of the record on which the

Secretary's decision purports to rely.  The Department then acquiesced in the OIN's oversight and

direction of the vendor selected by the OIN, Malcolm Pirnie, Inc. ("Malcolm Pirnie").  Upon

information and belief the OIN – an interested party – had open and continuous access to Malcolm

Pirnie and DOI staff responsible for reviewing and making a recommendation concerning the OIN land

trust application.  In contrast the DOI repeatedly refused to permit other interested parties – the State

and the Counties – to have access to the information and materials provided by the OIN to Malcolm

Pirnie or to the DOI that ostensibly support the Determination.

     5.     The Determination itself is fundamentally at odds with the legislative policy that underlies

Section 465 and the IRA.  That statute was intended to put a stop to allotment of Indian lands pursuant

to the federal policy set forth in the Dawes Act of 1887, and to redress the loss of Indian lands under

the allotment system.  Section 465 was designed to provide for acquisition of "small tracts of land" to

allow "landless" Indians or tribes to become economically self-sufficient – a level of economic well-

being for a tribe and its members on par with non-Indians in the areas in which the Indians reside.

     6.     The Indian Gaming Regulatory Act ("IGRA") has conferred enormous financial benefits

on tribes like the OIN that are situated near large population centers.  The OIN has more than achieved

economic self-sufficiency through a casino that has generated over $300,000 in annual revenue per

enrolled tribal member, and there is no need to take into trust anything more than the land on which the

casino sits to accomplish that end.  Taking into trust for the OIN (or other tribes similarly situated) land

that will be used for additional economic development subverts the limited congressional goal underlying

Section 465 of relieving economic distress of tribes that had been subjected to the debilitating consequences of the federal allotment policy and converts the statute into a mechanism for the concentration of great economic wealth in the hands of a select few Indian tribes.  No federal policy supports the creation of super-rich tribal nation states, fed by tax-exempt gaming revenues, that can remove endless amounts of land from local and state regulation and taxation if, in the view of the Department, such removal furthers some amorphous goal of economic development or tribal self-government.

7.      The problem is highlighted by the Determination, which does not preclude future applications by the OIN to take additional land into trust and places no limit on the amount of land that ultimately may be taken into trust for the OIN.  Section 465, under which the Secretary purports to rely, itself places no limit on the amount of land that may be taken into trust for a tribe and contains no standard by which such determinations are made by the Secretary.  And it is clear that the OIN fully intends to continue to acquire land and have it taken into trust.  Indeed, the OIN, through Nation Representative, Ray Halbritter, described the Determination as an "initial step toward further securing our Oneida homelands."  With access to untaxed and essentially unlimited gaming revenues the OIN have both the capacity and will to acquire unlimited amounts of land in New York and to seek to displace state and local jurisdiction through the land-into-trust mechanism.

8.      The Department's purported use of Section 465 to take land into trust in these circumstances is an improper interference in state governmental authority that causes needless economic

injury to the State and its subdivisions and will only exacerbate existing tensions between Indian and non-Indian communities.

9.      This action is brought by the State of New York, David A. Paterson, in his capacity as Governor of the State of New York, Andrew M. Cuomo, in his capacity as Attorney General of the State of New York, the County of Madison, and the County of Oneida (collectively, "Plaintiffs") pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. § 701, et seq. for a permanent injunction preventing transfer of title of the OIN land to the United States, and a declaration that the Determination was arbitrary and capricious, an abuse of discretion, in excess of the Secretary's statutory authority, unconstitutional, and otherwise not in accordance with law.  The Plaintiffs seek a further declaration that the Determination was made in violation of the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), the National Environmental Policy Act, 42 U.S.C.  § 4321, et seq. ("NEPA"), and the criteria for taking land into trust found at 25 C.F.R. §§ 151.10 and 151.11.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361, which provide original jurisdiction in suits involving questions arising under federal law and suits to compel actions by federal agencies.

11.      The Plaintiffs' request for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202.  There currently exists an actual controversy between the parties.

12.     Judicial review is authorized by the Administrative Procedure Act, 5 U.S.C. § 701, et seq., because the Defendants' decision to take 13,003.89 acres of land into trust constitutes a final decision made on behalf of the Secretary and is not subject to further administrative review.

13.     Venue in this Court is proper under 28 U.S.C. §§ 1391(b)(2), and 1391(e)(2) and (3), and 5 U.S.C. § 703 because a substantial part of the events giving rise to the claims occurred in this District; the property that is the subject of the action is situated in this District; and Plaintiffs reside in this District.

### PARTIES

14.     Plaintiff State of New York is a body politic and sovereign entity and this action is brought in protection of the State's constitutionally reserved powers, governmental rights, and property interests, including its authority to tax and regulate the land, and activities on the land, within its borders.

15.     Plaintiff David A. Paterson, in his capacity as Governor of the State of New York, is the Chief Executive official of the State.  Governor Paterson brings this action in his official capacity.

16.     Plaintiff Andrew M. Cuomo, in his capacity as Attorney General of the State of New York, is the chief legal officer of the State.  Attorney General Cuomo brings this action in his official capacity.

17.     Plaintiff County of Madison, New York is a municipal government organized in 1806 under the constitution and laws of the State of New York.

18.     Plaintiff County of Oneida, New York is a municipal government organized in 1798 under the constitution and laws of the State of New York.

19.     Defendant United States Department of the Interior is an agency of the United States; Dirk Kempthorne is the Secretary of the Interior; P. Lynn Scarlett is the Deputy Secretary of the Interior; James E. Cason is the Associate Deputy Secretary of the Interior; and Franklin Keel is the Regional Director for the Eastern Regional Office of the Bureau of Indian Affairs ("BIA").  These defendants are responsible officers of the United States. Each bears responsibility for the decision to take into trust the land at issue.

## FACTS

The History of the Land

20.     The lands that are the subject of the Determination are part of the lands that were ceded by the Oneida Indians "to the people of the State of New York forever" in 1788 and are located within an approximately 250,000-acre area that was transferred to the State in a series of transactions beginning in 1795.

21.      As the lands were transferred the Oneidas moved off the land and the area was rapidly populated by non-Indians.  By the mid-1800's there were only 600 Oneidas in New York and there were only 500 acres in Oneida hands; by the latter part of the nineteenth century that number had dwindled to 32 acres.

22.     In fact, many of the Oneidas left New York entirely or disassociated themselves from the tribal remnants that would become the OIN.  For example, The Oneida Tribe of Indians of Wisconsin, The Oneida of the Thames, The Stockbridge-Munsee Community, and the New York

Brothertown Indian Nation have all alleged in federal court that they have an interest in the subject lands.

23.     Since the mid 1800's the area has been populated predominately by non-Indians. Today, there are about 235,469 people living in Oneida County and some 70,337 living in Madison County.  Substantially less than 1% are recorded as American Indians and Alaskan Native persons.

24.     The towns, villages and counties that exist today were established in the late eighteenth and early nineteenth century.  Sovereignty over the land which the OIN now seeks to have taken into trust passed to the State of New York directly from the British Crown during the Revolutionary War. At all relevant times, the State and municipal governments have exercised jurisdiction over such land. The State has never ceded jurisdiction over such land to the United States or agreed that the State's jurisdiction could be impaired or limited by taking the land into trust.

25.     Beginning in the mid-1990's the OIN acquired approximately 17,000 acres of land in fee simple with revenues generated from the conduct of a gaming facility of questionable legality described below.

The 1993 Gaming Compact

26.     In the early 1990's, the OIN sought to negotiate a compact with the State that would permit it to conduct casino type gaming under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 et seq.  In order to conduct lawfully such gaming under IGRA, a tribe must negotiate and enter into a valid compact with the State in which the gaming is to be conducted; the gaming must be

conducted on "Indian lands" as defined in IGRA; and the gaming must be conducted in accordance with a tribal ordinance adopted by the tribe having jurisdiction over such land.

27.     In 1993, then-Governor Mario Cuomo and Ray Halbritter, Nation Representative of the OIN, signed a gaming compact (the "Compact").

28.     Thereafter, the OIN constructed a gaming facility on land acquired and held in fee by the OIN and located in Verona, New York.  The OIN commenced gaming at its Turning Stone Resort & Casino ("Turning Stone Casino") in 1993 in the face of criticism of the validity of the compact and questions as to whether the land on which the Turning Stone Casino was erected came within the definition of Indian lands under IGRA.

29.     Subsequent judicial decisions have placed into doubt the legality of the operation of the OIN's Turning Stone Casino.

30.     The Supreme Court of the United States in City of Sherrill v. Oneida Indian Nation of New York, 544 U.S. 197 (2005) ("Sherrill"), held that the OIN does not have tribal jurisdiction on land acquired in fee such as the land on which the casino is located.  As a result, the casino property cannot be considered Indian land under IGRA, and the necessary tribal ordinance (which must be adopted by a tribe with "jurisdiction" over the land on which gaming is to be conducted) is lacking.

31.     Nonetheless, the OIN has continued to operate the casino, and the United States, which is charged with enforcement of IGRA, has failed to fulfill its statutory responsibility to require the OIN to comply with IGRA.  The DOI evidently intends to cure the lack of "Indian land" status of the casino property by taking the land into trust but in addressing the OIN's application the DOI has

9

refused to follow the procedures set forth in IGRA for taking into trust land that is to be used for gaming.

<u>Fruits of the Oneidas' Operation of the Casino and Other Business Enterprises</u>

32.     Turning Stone Casino, which consists of a more than 1 million square foot gaming, entertainment, and hotel complex, is an extraordinarily lucrative enterprise.

33.     A report issued in 2006 by Moody's Investors Services states that Turning Stone Casino brought in revenues of approximately $330 million in the 12 month period ending June 30, 2006. This equates to approximately $330,000 in revenue per enrolled member of the OIN.

34.     Upon information and belief, Turning Stone Casino generated Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA"), a widely used measure of financial performance, of no less than $107 million in the 12-month period ending June 30, 2006, which computes to over $100,000 per enrolled member of the OIN.

35.     Upon information and belief, in its Fiscal Year 2005, Turning Stone Casino transferred $45.5 million to the OIN.  This equates to approximately $45,500 per enrolled member of the OIN exclusive of income that OIN members receive from working at Turning Stone Casino or other OIN enterprises.

36.     Upon information and belief, the enterprise value of Turning Stone Casino and related facilities was between approximately $2.15 and $2.31 billion as of December 31, 2006, which equates to approximately $2.2 to $2.3 million per enrolled member of the OIN and $6.3 to $6.7 million per OIN household.

37.    The OIN's business enterprises are not limited to its Turning Stone Casino. Through its Oneida Nation Enterprises, the OIN operates a chain of 13 SavOn convenience stores, a gaming equipment manufacturer, marinas, and a fishing resort which, upon information and belief, collectively had an enterprise value of approximately $293.8 million as of December 31, 2006.

Location and Current Status of OIN-Owned Land

38.    Rather than acquiring parcels that were contiguous to its casino or to the 32 acres of land in Madison County that had been in Oneida hands for centuries, in the last 15 years the OIN has acquired parcels that are scattered throughout Madison and Oneida counties, creating a patchwork of holdings.

39.    Following acquisition of those properties the OIN refused to pay real property tax on the land itself and refused to comply with state and local zoning, land use, environmental, and other regulations. The OIN also has refused to collect and remit state and local sales tax on sales of products, including gasoline and tobacco, to non-Indians.

40.    In 2000, the OIN brought an action to challenge the enforcement of real property taxes against the OIN on land it owned in the City of Sherrill. On March 29, 2005, the Supreme Court determined that the OIN could not establish tribal sovereignty by purchasing the land and held that the land was not immune from local real property taxes.

41.    The Supreme Court in Sherrill made clear that its decision applied not only to local real property taxes but to state and local regulatory laws such as zoning and land use.

11

42.     In its decision the Supreme Court expressed concern about the patchwork jurisdictional pattern that would be created if the OIN properties were removed from state and local jurisdiction: "A checkerboard of alternating state and tribal jurisdiction in New York State-created unilaterally at OIN's behest-would seriously burde[n] the administration of state and local governments and would adversely affect landowners neighboring the tribal patches." Sherrill, 544 U.S. at 219-20 (internal quotations and citations omitted).

43.     Despite the Supreme Court's decision, the OIN has refused to pay outstanding real property taxes or to comply with state and local land use, zoning, environmental and other laws.

44.     The OIN's refusal to pay taxes has continued even after Defendant Cason informed the OIN on June 10, 2005, that the Sherrill decision obligated the OIN to pay its property taxes or face foreclosure of its land, and further that it was the DOI's policy not to accept into trust lands that are encumbered by tax liens.

The OIN Land Into Trust Application

45.     On April 4, 2005, a two page letter request for all OIN-owned fee lands to be taken into trust was submitted by OIN representative Ray Halbritter, to the Director of the Eastern Regional Office, BIA, United States Department of Interior.

46.     On September 20, 2005, the DOI advised George Pataki, then-Governor of the State of New York, and officials of the Counties, that it would consider the application to consist of land divided into three groups: Group 1, Group 2 and Group 3.

47.     The DOI requested comments from Plaintiffs as to each parcel grouping by specific

dates: Groups 1 and 2 by January 30, 2006, and Group 3 by March 1, 2006.

48.     Group 1 consists of 99 parcels of land totaling approximately 3,428 acres, and is

occupied primarily by the Turning Stone Casino and other OIN-developed properties. Group 1 is

located within the jurisdictional boundaries of Oneida County, with 2,196 acres located within the Town

of Verona, and 1,232 acres located within the Town of Vernon.

49.     Group 2 consists of 241 parcels of land totaling approximately 6,475 acres, and largely

consists of agricultural and rural properties, as well as OIN-developed commercial properties.  Of the

6,475 acres comprising Group 2, approximately 1,917 acres are located within the jurisdictional

boundaries of Madison Country, and approximately 4,557 acres are located within the jurisdictional

boundaries of Oneida County.

50.     Group 3 consists of 104 parcels of land, totaling 7,407 acres scattered throughout

Madison and Oneida Counties.  The Group 3 parcels are generally undeveloped, active or inactive

agriculture, and lands that are subject to a competing tribal claim by the Stockbridge-Munsee

Community of Wisconsin, an Indian Tribe located in the State of Wisconsin.

The Unprecedented Nature of the OIN's Application

51.     The OIN's application is unprecedented in several respects.  First, no Indian land in

New York is now or has ever been held in trust for Indians by the United States.  Moreover, no Indian

lands in New York have been taken into trust under the IRA as the New York tribes, including the

OIN, elected not to have the IRA apply to them.

52.      Second, the OIN's application is extraordinary in terms of the amount of land it seeks to have taken into trust.  The Secretary has never taken into trust many thousands of acres of land scattered across populated and long established non-Indian communities in eastern states. Indeed, the only time that a significant amount of land has been taken into trust for an eastern tribe was in Maine pursuant to a specific Act of Congress, and in that case the land was essentially uninhabited.  No such Act of Congress has been enacted with regard to the OIN's unprecedented application.

53.      Third, the OIN holdings consist of hundreds of different and predominantly non-contiguous parcels scattered throughout a two-county area.  The OIN's application would permanently create precisely the sort of patchwork jurisdiction that the Supreme Court condemned in Sherrill.

The DOI's Flawed Review of the OIN's Application

54.      As set forth above, the statute, 25 U.S.C. § 465, contains no intelligible principle to guide the Secretary's decision, and this defect is not cured by the DOI's regulations which require the Secretary to consider certain enumerated factors in determining whether to grant a request to take land into trust.  See 25 C.F.R. 151.10-11.  None of these factors sets forth in any meaningful, concrete way standards to be employed by the Secretary in determining whether land should be taken into trust.

55.      Additionally, NEPA requires the Secretary to consider the environmental impact of proposals to take land into trust after soliciting the views of the local and state governments who are affected by the land-into-trust decision.  See 42 U.S.C. § 4332(2)(C).

56.      Pursuant to NEPA, the DOI undertook to draft an Environmental Impact Statement ("EIS") documenting the environmental impact of the OIN's request to take the subject land into trust.

14

57.     Upon information and belief, the OIN dominated from the inception the process by which the EIS was drafted and the DOI failed to participate meaningfully in or critically evaluate either the EIS or its underpinnings as required by NEPA.

58.     The DOI's failure to evaluate meaningfully the EIS is a crucial defect because the EIS served as the vehicle for developing much of the factual record on which the ROD ultimately rests, and is the basis on which the ROD purports to evaluate the factors enumerated in 25 C.F.R. § 151.10. Given that process, the reality is that the OIN was the principal architect of the decision on its own application.

59.     In the fall of 2005, the DOI acceded to the OIN's selection of the engineering consulting firm Malcolm Pirnie to draft the EIS.  Malcolm Pirnie, apparently under OIN direction, had actually drafted significant portions of the EIS even before the scope of the EIS had been finalized.

60.     Following selection of Malcolm Pirnie, the DOI, the OIN, and Malcolm Pirnie entered into a three-party Memorandum of Agreement (the "MOA") which permitted the OIN (but not the Plaintiffs) to review requests from other entities to become "cooperating agencies" and thus participate in the drafting of the EIS to the extent permitted by the DOI.

61.     The first step in drafting an EIS is to produce a "scoping report" which identifies the issues to be considered in the EIS.

62.     The OIN was permitted to participate fully in drafting the scoping report.  In contrast, the Plaintiffs were not granted cooperating agency status until immediately prior to the issuance of the

scoping report and, as a result, were effectively excluded from the critical process of defining what issues were to be considered in the EIS.

63.     In addition, despite the fact that the Plaintiffs were each eventually designated "cooperating agencies" pursuant to a memorandum of understanding entered into between the parties, the DOI refused to provide the Plaintiffs with information that was supplied by the OIN to Malcolm Pirnie upon which significant conclusions in the EIS are based.

64.     Plaintiffs attempted to obtain copies of the documents supplied by the OIN to Malcolm Pirnie, and other documents relevant to the OIN's land-into-trust request, pursuant to FOIA, by making a series of FOIA requests to the DOI but the DOI has frustrated those attempts.

65.     For example, on October 30, 2006, the Counties propounded an FOIA request on the DOI (the "County Request"), requesting documents pertaining to the OIN's land into trust application.

66.     On January 10, 2007, the State propounded a similar request on the BIA, Eastern Regional Office (the "State Request").

67.     The DOI responded to the County Request on March 19, 2007, estimating that it had 50,000 to 60,000 pages of responsive documents in its possession and that such documents would cost between $8,240 and $9,540 to produce.

68.     Thereafter, a check in the amount of $9,540 was sent to the DOI to cover the cost of production of the County Request.

69.     The DOI responded to the State Request on June 25, 2007, estimating that it had 50,000 to 60,000 pages of responsive documents in its possession and that such documents would cost between $8,240 and $9,540 to produce.

70.     To avoid duplication of efforts, the State requested that the DOI provide it with only those documents that were both responsive to the State Request and not responsive to the County Request.  The DOI stated that it had such documents in its possession and described those documents as "Level One Documents."

71.     Despite repeated assurances by the DOI beginning in May, 2007 that the documents responsive to both the County Request and State Request were being reviewed and would be produced, as of the date of this Complaint, the DOI has not produced the requested documents or offered any explanation for the failure to produce such documents.

OIN Use of Former Government Officials to Attempt to Influence the DOI

72.     To support its application, the OIN retained a former senior official of the DOI and the Department of Justice who had been involved as a government official in OIN claims against the State and the Counties, to lobby for the OIN with respect to the land into trust application.  That official, Thomas L. Sansonetti, was an Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice from 2001 to 2005 and formerly a high ranking official in the DOI. Upon information and belief, in his prior positions Mr. Sansonetti had worked closely with Defendant Cason and others in the DOI on matters including the United States' involvement in litigation relating to the OIN.

73.     Shortly after Mr. Sansonetti's departure from the Department of Justice, he joined the law firm Holland & Hart LLP.  The OIN then retained Mr. Sansonetti's law firm for the purpose of lobbying the DOI on its behalf with respect to the OIN's land-into-trust application.

74.     Federal Lobbying Disclosure forms filed by Mr. Sansonetti's law firm show that it earned approximately $520,000 from this engagement for the period July 1, 2006 to December 31, 2007.

75.     Upon information and belief, among other things, Mr. Sansonetti arranged for a private, personal visit by Defendant Cason to OIN facilities in central New York.  In addition, Mr. Sansonetti evidently had numerous *ex parte* communications with Defendant Cason in an effort to convince Cason to act favorably on the OIN application and to take all or the vast majority of the OIN land holdings into trust.  Documents produced to Plaintiffs concerning this activity indicate that in 2007 Mr. Sansonetti made a "final entreaty" regarding the DOI's selection of a "preferred alternative" with respect to the draft EIS.

The Draft and Final EIS

76.     The draft EIS prepared by Malcolm Pirnie does not provide an objective basis for evaluating the OIN's request as is mandated by NEPA, the IRA, and their respective implementing regulations.  For example, while the OIN requested that approximately 17,000 acres be taken into trust, an "Alternative B" was considered which contemplated the Secretary taking 35,000 acres into trust an amount of land the OIN neither owns nor requested be taken into trust.

77.     The draft EIS was circulated following its completion and comments were accepted from interested parties.  The Plaintiffs provided the DOI with extensive comments concerning the deficiencies in the draft EIS, including reliance on erroneous data and use of unreasonable "taxation/jurisdiction" scenarios.  The deficiencies also included the EIS's failure to properly consider:

(a)     the extraordinary wealth of the OIN in analyzing whether the proposed transfer of land into trust was justified by the need to secure the economic self-sufficiency of the OIN;

(b)     the jurisdictional and administrative problems that taking a large number of non-contiguous properties into trust and arguably outside of the Plaintiffs' jurisdiction would cause;

(c)     the environmental impact of probable future development by the OIN on the land taken into trust, and;

(d)     the DOI's inability to oversee the lands taken into trust.

78.     The DOI largely either ignored or dismissed the Plaintiffs' comments with respect to the draft EIS.

79.     The Final EIS ("FEIS") selects "Alternative I," which was never previously identified to Plaintiffs and which consists of taking 13,086 acres of land into trust, as the DOI's "Preferred Alternative."

80.     Despite the ample commentary provided by the Plaintiffs with respect to the draft EIS, the FEIS:

(a)     relies on incorrect data and glosses over reliable data and conclusions provided by qualified experts;

19

(b)        justifies taking land into trust by the OIN's need for economic growth and self-sufficiency despite the fact that the approximately 1,000 member OIN owns extraordinarily lucrative businesses, which upon information and belief, are worth more than $2 billion, as more thoroughly described in paragraphs 32 to 37, and has developed this business empire without any land-into-trust transfers;

(c)        fails to consider properly the costs and administrative problems that a more than 13,000-acre checkerboard reservation spread across two counties and numerous municipalities will cause the affected governments;

(d)        assumes that future OIN development of the land taken into trust will not be harmful to the environment, either individually or in the aggregate, once the trust land is arguably taken outside of the Plaintiffs' regulatory jurisdiction;

(e)        fails to discuss adequately the DOI's fiscal or staffing ability to govern the land taken into trust or the BIA, Eastern Regional Office's ability to manage such lands;

(f)        ignores the OIN's past violations of federal, state and local environmental, health, safety and land use laws, (including, without limitation, illegal filling of wetlands in construction of golf courses and gasoline stations; construction of a co-generation energy facility without requisite Clean Air Act permits and approvals; demolition of buildings, including possibly buildings containing asbestos, without proper permits or requisite notifications; illegal dredging of Oneida Lake; and construction of Turning Stone Casino to a height five times greater than the applicable laws allowed and without compliance

with other applicable laws) and accepts these continuing illegal conditions as the current "baseline" from which the OIN's unprecedented request for land into trust should be judged;

(g)     concludes that the OIN will keep its conditional promises that if the DOI grants the OIN's request, the OIN will consider complying with some laws and regulations and the OIN will not make any further changes to the use of the land despite evidence in the administrative record identifying prior situations where the OIN has violated federal, state, and local laws and regulations thereby creating significant governance issues for the state and localities; and

(h)     also relies on third party data, work product and analyses that are not provided in the exhibits to the EIS.  Specifically, the FEIS references, but does not provide, analyses, work product and/or data from at least six third parties, thereby preventing review, replication and validation of such analyses, work product and data.  Similarly, the FEIS draws its conclusions from tables and analyses for which the underlying data were withheld from the Plaintiffs.

The Record of Decision

81.     On May 20, 2008, the Secretary issued the ROD setting forth his decision to take 13,003.89 acres of OIN-owned land into trust.

82.     The ROD is a biased document.

83.     The bias of the ROD is apparent from the document's very beginning.  For example, the ROD contains a discussion of nine alternative plans to take land into trust denominated "Alternative A" through "Alternative I."  The Counties' proposed alternative, which called for taking land containing Turning Stone Casino, along with other lands appropriate to support the OIN's economic, housing, and

21

self-determinations needs into trust, subject to certain conditions concerning the OIN's future conduct, was not fully analyzed in the ROD.

84.     In discussing the proposed plans the ROD sets forth the percentage of land to be taken into trust with respect to each County rather than the municipalities most greatly affected.  For example, Alternative I, the DOI's preferred alternative, is described in the summary contained in Page 19 of the ROD as representing 1.05% of the combined acreage of the Counties rather than property that, by value, represents approximately half of the taxable property of the Vernon-Verona-Sherrill Central School District and the Town of Verona.

85.     The ROD essentially ignores the enormous revenue impact the Determination will have on the Plaintiffs by relying on the fact that the OIN has for years refused to pay taxes on its properties. As a result, according to the Determination, the effect of permanently removing the subject lands from the Plaintiffs' tax rolls is simply to maintain the status quo.

86.     Further, the ROD equates the OIN's occasional "voluntary payments" to defray the cost of certain services rendered by State and local governments to the OIN with tax revenue.  These payments are cited as a basis for the conclusion in the ROD that the decision to take land into trust will be revenue-neutral as to the affected local governments.

87.     In fact, the OIN in the past has unilaterally discontinued such voluntary payments when it was displeased with the recipient government.  For example, in one instance, the OIN withheld approximately $150,000 in promised "Silver Covenant" payments to a financially stretched school district (the Stockbridge Valley Central School District) because it refused to fire an Indian teaching

22

assistant who had joined a dissident group of Oneida Indians in litigation against the OIN.  Upon information and belief, this "Silver Covenant" payment was significant to the Stockbridge Valley Central School District because it was the only payment received from the OIN notwithstanding the fact that the OIN owned approximately 16% of the land within its geographic boundaries.

88.     In another instance, the OIN unilaterally decided to change the formula under which it paid for the fire fighting services rendered by the Verona Volunteer Fire Department to the OIN at its Turning Stone Casino.

89.     This decision was extraordinarily detrimental as the Town of Verona (population 6,425) has limited need, apart from that created by the OIN, for the type of fire fighting apparatuses and expertise necessary to protect the over 1,000,000 square foot Turning Stone Casino complex.

90.     The FEIS and ROD analyze the effect of Turning Stone Casino and all other OIN enterprises closing despite the lack of any evidence whatsoever that this would occur should the Secretary deny, in whole or in part, the OIN's application to take land into trust.  This scenario, of course, makes the Determination look like the better alternative.  This scenario is so implausible that the ROD repeatedly states, without explanation since none is needed, that the "Department disputes" it.

91.     The ROD also inappropriately attributes taxes paid by others, such as employees of the OIN, to the OIN for purposes of analyzing the extent to which the Determination deprives the Plaintiffs of tax revenues.

92.     In addition to the forgoing, the State and Counties, among other persons and entities, each submitted comments with respect to the FEIS that were ignored or inadequately addressed in the ROD.

**FIRST CAUSE OF ACTION**

**25 U.S.C. § 465 IS AN UNCONSTITUTIONAL
DELEGATION OF LEGISLATIVE AUTHORITY**

93.     Repeat and reallege the allegations of paragraphs 1 to 92 as if fully set forth herein.

94.     It is fundamental that Congress may not delegate its policymaking functions to an administrative agency in the absence of an "intelligible principle" that limits the agency's exercise of that authority.

95.     Section 465 violates these precepts by giving the Secretary of the Interior unbounded discretion to acquire land "for the purpose of providing land for Indians."  The statute contains no limiting standards.  The regulations, which cannot in any event provide a standard where the statute contains none, are similarly lacking in any meaningful standard.  Those regulations merely list factors that the Secretary should consider when taking land into trust, but place no boundaries upon that authority.

96.     The delegation of unbounded discretion to the DOI is particularly offensive to the Constitution because the DOI is a federally mandated trustee of Indian lands.  The lack of any statutory limits on the Secretary's exercise of discretion when deciding to take land into trust, when considered together with the DOI's institutional bias in favor of Indians, creates a decision-making process that is unbalanced and unfair.

24

97.     As a result, Section 465 is an unconstitutional delegation of legislative authority, is in violation of the separation of powers principles contained in the Constitution, and is invalid.

## SECOND CAUSE OF ACTION

## 25 U.S.C. § 465, AS APPLIED, VIOLATES THE TENTH AMENDMENT

98.     Repeat and reallege the allegations of paragraphs 1 to 97 as if fully set forth herein.

99.     The Tenth Amendment reserves to the States, or the People, those powers not granted to the United States by the U.S. Constitution.

100.    The State has continuously exercised jurisdiction over its lands since the adoption of the U.S. Constitution, including the lands which are the subject of the Determination, and has never consented to the removal of such land from State jurisdiction.

101.    The U.S. Constitution does not grant to the United States the authority to remove land from a State's jurisdiction for the purpose of providing such land to an Indian tribe without first obtaining the consent of the affected State.

102.    The U.S. Constitution clearly enumerates those limited instances where the United States has the authority to remove lands from a State's jurisdiction.  For example, Article I, Section 8, Clause 17 of the U.S. Constitution grants Congress the power "[t]o exercise exclusive Legislation in all Cases whatsoever... over all Places purchased *by the Consent of the Legislature of the State in which the Same shall be*, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings." (emphasis added).  Similarly, no other provision of the U.S. Constitution authorizes the Secretary to remove the subject lands from the State's jurisdiction without its consent.

25

103.    The State has not consented to the Secretary's decision to remove the subject lands from its jurisdiction.

104.    Article I, Section 8, Clause 3 of the U.S. Constitution confers upon Congress the power "[t]o regulate "commerce ... with the Indian tribes" but regulation of commerce with  Indian tribes does not extend to removal of land located within states from state and local jurisdiction.

105.    Section 465 far exceeds the power granted to Congress to regulate commerce with the Indian tribes, is unauthorized by any other provision of the U.S. Constitution, and deprives the State of its sovereignty with respect to lands taken into trust.

## THIRD CAUSE OF ACTION

## 25 U.S.C. § 465 DOES NOT APPLY TO THE OIN

106.    Repeat and reallege the allegations of paragraphs 1 to 105 as if fully set forth herein.

107.    Section 465 was enacted as part of the IRA.  That statute was intended to put a stop to allotment of Indian lands pursuant to the federal policy set forth in the Dawes Act of 1887, and to redress the loss of Indian land under the allotment system.

108.    The provisions of Section 18 of the IRA (25 U.S.C. § 478) condition application of the IRA on a vote of the affected Indians.  When a majority of the adult Indians in a reservation "shall vote against application" of the Act, it "shall not apply."  Following the adoption of the IRA, the Oneidas (as well as other New York Indians) voted to reject the IRA.

109.    Under the plain terms of Section 478, Section 465 is not available to the OIN.

110. By purporting to take land into trust for the OIN under Section 465, the Secretary acted in excess of his authority and not in accordance with law.

111. Although the ROD cites 25 U.S.C. § 2202, which states that "[t]he provisions of Section 465 of this Title shall apply to all tribes notwithstanding the provisions of Section 478 of this Title," it does not mention 25 U.S.C. § 2201, which defines "tribe" to mean "any Indian tribe, band, group, pueblo, or community for which, or for the members of which, the United States holds lands in trust."

112. Since the United States held no OIN land in trust prior to the time of the trust application, the OIN was not a "tribe" within the meaning of Section 2202, and Section 2201 therefore makes Section 465 unavailable to the OIN.

113. Section 465 does not authorize the Secretary to take land into trust for the benefit of the OIN for the separate reason that Section 465 authorizes the acquisition of lands only "for the purpose of providing land for Indians."

114. 25 U.S.C. § 479 defines "Indians" for purposes of the IRA to "include all persons of Indian descent who are members of any recognized tribe *now* under federal jurisdiction." (emphasis added) Upon information and belief, the OIN does not meet this requirement as the OIN was not a "recognized tribe *now* under federal jurisdiction" as of the date of the IRA's enactment in 1934.

115. Accordingly, the Secretary may not take the subject land into trust for the benefit of the OIN because the IRA, by its express terms, allows land to be taken into trust only for the benefit of tribes that were federally recognized as of the IRA's 1934 enactment.

116.    Notably, the ROD does not consider in a meaningful or complete way the absence of statutory authority as required by Section 151.10(a) of its own regulations.

117.    In light of the fact that there is no statutory authority for the Secretary to take land into trust for the OIN, the Determination was arbitrary and capricious, an abuse of discretion, in excess of the Secretary's statutory authority, and otherwise not in accordance with law.

**FOURTH CAUSE OF ACTION**

**THE DETERMINATION WAS NOT IN ACCORDANCE WITH LAW BECAUSE IT WAS MADE CONTRARY TO PRIOR DOI POLICIES**

118.    Repeat and reallege the allegations of paragraphs 1 to 117 as if fully set forth herein.

119.    The purpose of 25 U.S.C. § 465 is to enable landless Indian tribes or tribes with inadequate land resources to become economically self-sufficient.

120.    Consistent with this purpose, the DOI, historically, has taken the position that it will not take additional land in trust from tribal groups that have the ability to manage their own affairs and who have been highly successful through their own efforts.

121.    The OIN has earned hundreds of millions of dollars from its business activities, which clearly demonstrates its "ability to manage its own affairs" and the success of its own efforts.

122.    The DOI's longstanding policy has been not to take land into trust unless marketable title may be conveyed to the DOI by the fee owner of the property.  The OIN lands are subject to outstanding tax liens, which under well-established principles render title unmarketable.  The Determination nonetheless proposes to take such land into trust.

123.     Even if Section 465 was constitutional and available to the OIN (which it is not) the

Determination is antithetical to the policies underlying that statute and adopted by the DOI.

## FIFTH CAUSE OF ACTION

## THE DETERMINATION WAS INFECTED WITH BIAS TOWARD THE OIN IN VIOLATION OF THE PLAINTIFFS' CONSTITUTIONAL DUE PROCESS RIGHTS

124.     Repeat and reallege the allegations of paragraphs 1 to 123 as if fully set forth herein.

125.     Due process requires that the determination to take land into trust be made in an

impartial manner.

126.     The manner in which the Determination was made reflected bias in favor of the decision

to take the subject lands into trust.

127.     For example, Malcolm Pirnie, which drafted the EIS upon which the Determination was

based, was selected and compensated by the OIN.

128.     Such selection was memorialized in the MOA entered into during December 2005 by

and between Malcolm Pirnie, the BIA, and the OIN.  The State and Counties were not parties to the

MOA nor asked or permitted to provide input in selecting the party to draft the EIS.

129.     The selection process was run entirely by the OIN and its outside counsel.  In an

October 12, 2005 letter to Franklin Keel, Regional Director, BIA Eastern Regional Office, the OIN's

outside counsel, Zuckerman Spaeder LLP ("Zuckerman Spaeder"), noted that Zuckerman Spaeder

itself had both created the list of potential candidates for the project and conducted the initial screening

and in-person interviews of the candidates it had identified.  The letter states that "Malcolm Pirnie emerged as the best candidate selected for the project, subject to the [BIA's] concurrence."

130.    The same letter requested that the DOI approve the selection of Malcolm Pirnie on the basis of background information on the four finalist candidates appended to the letter.  Such background information consisted nearly entirely of printouts from publicly available websites.

131.    The EIS's bias reflects the fact that the EIS is an advocacy piece that was commissioned by the OIN's outside counsel rather than an objective evaluation of the environmental consequences of taking the subject lands into trust as is mandated by NEPA and its implementing regulations.

132.    Many elements of the EIS were, in fact, agreed to between Malcolm Pirnie and the OIN prior to the start of the EIS process.  On October 6, 2005, Malcolm Pirnie prepared an "outline" of the EIS which described the content of the EIS including the predetermined conclusion that there was "need" to take lands into trust on behalf of the OIN and that the "[e]xisting condition of [the subject] lands is the baseline going forward for impact assessment."

133.    Additionally, as set forth in paragraphs 64 to 71 above, the DOI ignored its obligations under FOIA.  The DOI has acknowledged that its own regulations and FOIA require it to produce the documents upon which the EIS was based, and in fact the DOI accepted a check from the Plaintiffs in the sum of $9,540 for the production of such documents.  Nevertheless, the DOI has yet to provide the documents upon which the EIS was based to the Plaintiffs.

134.    The actions of the DOI in violation of FOIA further reflect the DOI and the BIA's bias in favor of taking the subject lands into trust.  The DOI's failure to produce the requested documents deprived Plaintiffs of their due process rights to address the evidence submitted in support of the OIN's application.

135.    The DOI's biased consideration of the OIN's land into trust application is consistent with the fact that the OIN dominated the EIS process by hiring a former DOI and DOJ official, whose officials duties, among others, concerned the United States' involvement in litigation relating to the OIN as described in paragraphs 72 to 75, above.

136.    The Secretary's analysis of the evidence and facts in reaching the decision was not fair, impartial, objective or reasonable.

137.    Accordingly, the Determination was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.

## SIXTH CAUSE OF ACTION

## THE DETERMINATION WAS MADE WITHOUT REGARD TO THE RELEVANT FACTORS UNDER 25 CFR PART 151

138.    Repeat and reallege the allegations contained in paragraphs 1 to 137 as if fully set forth herein.

139.    Defendants wrongfully applied the regulations in 25 C.F.R. § 151.10 in granting the application because the Defendants wrongfully characterized the OIN's land-into-trust application as an "on-reservation" request.

140.    Section 151.10 applies only to land located within an "Indian reservation." The definitional section of the DOI's regulations applicable to land-into-trust application defines "Indian Reservation" as "that area of land over which the tribe is recognized by the United States as having governmental jurisdiction . . . ." The United States does not recognize the OIN as having governmental jurisdiction on any of the land that is the subject of the land into trust application, a fact that is clear from Sherrill.

141.    In deciding that the OIN had no right to exercise tribal sovereignty on the subject lands, the Supreme Court in Sherrill held in substance that the land lacked reservation (and Indian country) status. The language of the Court's decision, which repeatedly characterized the reservation in the past tense, is entirely consistent with that conclusion.

142.    Consequently, the application should have been treated under 25 C.F.R. § 151.11.

143.    Section 151.11 requires that greater weight be given to state and local concerns in assessing the application.

144.    In any event, the factors set forth in both sections 151.10 and 151.11 militate against taking OIN land into trust.

145.    The Determination was therefore arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.

## SEVENTH CAUSE OF ACTION

## THE DETERMINATION WAS MADE WITHOUT REGARD TO 25 C.F.R. § 151.10(b)

146.    Repeat and reallege the allegations of paragraphs 1 to 145 as if fully set forth herein.

147.     Assuming *arguendo* that Section 151.10 applies to the review of the OIN's application, 25 C.F.R. § 151.10(b) directs the Secretary to consider the tribe's need for the additional land.  The ROD states that "a demonstration of necessity may take into account … economic need and may also consider the tribe's need for land to support self-determination and tribal housing."

148.     The ROD contains no findings that support a conclusion that taking any amount approaching 13,003.89 acres of land into trust is necessary to satisfy any of these goals.  Aside from general assertions such as that the Determination will "support[] tribal economic development," (ROD at 35) which is doubtless true whenever land is exempted from taxation and removed from local regulatory jurisdiction to which surrounding land held by non-Indians is subject, the ROD contains no particularized explanation for why the OIN "needs" to have 13,000+ acres of land taken into trust.

149.     There is no reason why the OIN needs to, or should, enjoy the significant economic advantages over surrounding non-Indian businesses that come with having its land exempt from local taxes.

150.     Turning Stone Casino and related facilities, which are located on 225 acres of land, are more than sufficient to secure the economic self-sufficiency of the OIN and its members.  Upon information and belief, the enterprise value of Turning Stone Casino and related facilities was between approximately $2.15 and $2.60 billion as of December 31, 2006, which equates to approximately $2.2 to $2.6 million per enrolled member of the OIN and $6.3 to $6.7 million per OIN household.

151.    Nor can tribal self-determination or housing justify the massive transfer of land into trust contemplated by the ROD.  Together with the casino property, the land on which much of the OIN's governmental offices and housing for its members are located comprise slightly more than 1,000 acres.

152.    The record does not support a finding that the OIN has need for the lands to be taken into trust. Therefore, the Determination was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.

## EIGHTH CAUSE OF ACTION

## THE DETERMINATION WAS MADE WITHOUT REGARD TO 25 C.F.R. § 151.10(e)

153.    Repeat and reallege the allegations of paragraphs 1 to 152 as if fully set forth herein.

154.    Assuming *arguendo* that Section 151.10 applies to the review of the OIN's application, 25 C.F.R § 151.10(e) directs the Secretary to consider the impact on the State and its subdivisions of the removal of the land from the tax rolls.  Here, the Secretary failed to consider adequately this impact by simply claiming that the impacts of removing lands from the tax rolls are not significant when balanced with the benefits to the OIN of taking the lands into trust.

155.    Significantly, the decision to take the OIN land into trust removes the land from the tax rolls of the localities.  The decision was made without regard to the drastic consequences of this revenue loss.  The combined annual anticipated loss of county, municipal and school taxes, resulting from the removal of all of the OIN parcels (Groups 1, 2 and 3) is estimated to be over $16.2 Million.  This number does not take into consideration potential increases in the taxes on the subject parcels due to

34

increases in tax rates and assessed value or increases resulting from future development and improvement of the property.

156.    Given the OIN's demonstrated historical pattern of development, it is reasonable to assume it will continue to develop its properties profitably, and the loss of future tax revenue will be substantially greater in the future than is reflected by the current figures.

157.    For example, OIN-owned properties represent, by value, approximately 48% of the taxable property in the Vernon-Verona-Sherrill Central School District.  Such parcels represent about $10.2 Million in school district revenue annually.

158.    Additionally, the total amount of acreage owned by the OIN in the Town of Stockbridge to be taken into trust alone constitutes approximately 14% of the Town's total acreage. The annual real property taxes (including school taxes) in Stockbridge that would be lost on these parcels is approximately $133,500.

159.    The Town of Verona, where Turning Stone Casino is located, would be especially strongly impacted.  The Town of Verona would experience an annual loss of over half of its total property tax levy.

160.    The cumulative outstanding real property taxes on the OIN properties in Oneida County is over $46 Million, and the cumulative amount of delinquent taxes on the OIN properties in Madison County is $7.5 Million.

161.    The lost taxes represent a significant portion of the total tax revenues for the taxing authorities in question.

162.     The tax effect is exacerbated by the unfair competitive advantage that the OIN would receive by having the land held in trust.  Non-Indian business unable to compete may shut down, with an additional loss of tax revenues to the Counties in the form of lost property and sales tax.

163.     The loss of taxes imposes the cost of local services used by OIN enterprises and members – schools, road and bridge maintenance and repair, police and fire protection – on a smaller group of non-Indian New Yorkers, increasing the cost for these services.  Since the OIN receives the benefit of those services – e.g. Oneida children attend local schools, individual Oneidas and customers of OIN businesses use local roads and receive police and fire protection – the non-Indian community is footing the bill for these services for the OIN.  This effect is particularly acute because in some cases, the demand for the services actually has increased as a result of OIN activity on OIN-owned land.  For example, the Turning Stone Casino has resulted in dramatically increased traffic on local streets and higher demand for emergency services.

164.     Further, the ROD gives undue credit to the OIN for those voluntary payments it sometimes chooses to make for municipal services.  For example, the ROD refers to the OIN's provision of funds to the Verona Volunteer Fire Department through a "Voluntary Service Agreement." The ROD omits the fact that the OIN unilaterally changed the formula under which it made such payments to the Verona Volunteer Fire Department through the Voluntary Service Agreement.  Such payments are extraordinarily important to the Verona Volunteer Fire Department as the Turning Stone Casino is over 1,000,000 square feet and over 20 stories tall and thus is by far the largest building in the Verona Volunteer Fire Department's service area.

165.    Similarly, the ROD gives great weight to the OIN's "non-binding" commitment to continue paying for various services which it or its members use.  The ROD ignores not only the history of the OIN's relationship with local governments but also that the OIN will lose its incentive to keep making voluntary payments after the subject lands have been taken into trust.  Without justification, the ROD states that "[i]t can reasonably be expected that the [OIN] will continue to pay local governments for services provided."

166.    The ROD contains unwarranted conclusions with respect to mitigation of the direct revenue loss to Plaintiffs.  One such conclusion is that any taxes paid by an OIN employee or vendor should be treated as payments made by the OIN for purposes of the ROD.

167.    The ROD states that "[OIN] employees paid an estimated $5.55 million in local property taxes in 2004" and further that this amount is expected to be maintained or increase through 2011 if the subject lands are taken into trust.  The ROD ignores the fact that many of the OIN's employees do not live in the Counties or the communities most directly affected by the Determination and therefore it is unreasonable to suggest that such governments are being made whole by property taxes paid by employees of the OIN.

168.    The same unwarranted conclusion is implicit in the statement that "[t]he [OIN] withheld and remitted $3.38 million in New York State income taxes from its employees in 2005."  ROD at 47.

169.    Moreover, the premise of the ROD's reliance on taxes paid by OIN employees – that the OIN is entitled to credit for taxes paid by others – is without basis.

170.    Accordingly, the Determination was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.

## NINTH CAUSE OF ACTION

## THE DETERMINATION WAS MADE WITHOUT REGARD TO 25 C.F.R. § 151.10(f)

171.    Repeat and reallege the allegations of paragraphs 1 to 170 as if fully set forth herein.

172.    Assuming *arguendo* that Section 151.10 applies to the review of the OIN's application, 25 C.F.R § 151.10(f) directs the Secretary to consider jurisdictional problems and potential conflicts of land use that may arise.  The Determination failed to consider adequately potential land use and other jurisdictional problems, as detailed more fully below and in the NEPA claim herein.

173.    Taking the OIN's lands into trust results in an unworkable jurisdictional patchwork which the Supreme Court expressly sought to avoid in Sherrill.  At the heart of the Court's decision in Sherrill is the concern that allowing tribally-owned land located randomly throughout communities in Central New York to be removed from State and local jurisdictions would fundamentally and irreparably injure the affected communities by disrupting the "governance of central New York's counties and towns." Sherrill at 1483.  The Court in Sherrill was particularly concerned about the effects of the OIN's position on local zoning and land use controls.

174.    The Court's language reflects a recognition that communities cannot be maintained without the ability to govern in a coherent and comprehensive fashion.

175.    The DOI's land-into-trust regulations were enacted before the Supreme Court decision in Sherrill.  As a result, the regulations are silent as to evaluating the checkerboard jurisdictional

problems that were of central concern to the Supreme Court.  The problems of checker-boarding are dismissed or outright ignored in the ROD.

176.     In fact, the decision to take into trust hundreds of parcels scattered throughout Madison and Oneida Counties, which would institutionalize a patchwork of tribal land holdings, is an obvious effort to circumvent the types of concerns articulated by the Court in Sherrill.  It is also fundamentally at odds with one of the core purposes of the IRA, namely, to consolidate Indian holdings.

177.     The dispersed and non-contiguous character of OIN holdings creates a host of jurisdictional and regulatory problems.

178.     First, the effectiveness of a body of regulatory law rests on the ability of the state or local government uniformly to enforce certain laws throughout a broad geographic area.  To the extent taking land into trust removes a particular piece of land from the scope of regulatory law it may render the law ineffective as to surrounding land as well.

179.     Second, granting the application may place OIN land beyond the reach of the State's comprehensive environmental protection program, frustrating an important New York State policy of environmental protection.

180.     Third, placing OIN land into trust may render inapplicable to OIN lands a significant number of laws and regulations that are intended to protect the health and safety of guests and employees of business establishments, preventing the State from providing such protection to its Indian and non-Indian citizens alike.

181.    It is impossible to design and implement a unified and coherent zoning and land use plan when randomly located parcels within the community are not subject to local land use laws and can be developed for uses inconsistent with the overall regulatory framework.  To the extent that OIN land taken into trust status is exempt from zoning and other land use law, it poses a significant obstacle to the non-Indian communities' legitimate land use planning.  The effect is particularly acute on individual landowners whose property is located adjacent to non-conforming tribal use.

182.    The Determination would similarly impair the ability of local officials to monitor and enforce compliance with health, building, fire, and safety code requirements and other state and local regulations designed to benefit and protect all citizens in the area.  These include food handling laws, weights and measures, clean indoor air act (smoking restrictions), adolescent tobacco use prevention act, and bottle redemption and deposit.  The inability to monitor and enforce compliance with these laws may pose risks for visitors, emergency responders, and surrounding property owners.

183.    The ROD never comes to grips with these significant regulatory problems.  For example, the ROD acknowledges that the OIN has not obtained building permits or abided by zoning regulations but excuses this behavior by stating that "[o]verall, the [OIN's] uses are generally consistent with local zoning and the uses of adjacent non-[OIN] lands," with no discussion of the fact that this is simply not true in a number of critical areas, such as Turning Stone Casino.

184.    Specifically, Turning Stone Casino was constructed on agricultural land, forever changed this land and was not consistent with adjacent uses.  The casino complex includes a 120,000 square foot gaming floor, an arena and a 20-story hotel.  Upon information and belief, the casino

40

complex was constructed without regard for state and local building, zoning, environmental or fire

codes.  Further, the structures pose unique challenges to local emergency service organizations.  Upon

information and belief, the local fire department, for example, is not experienced in dealing with fires in

high rise structures and there is a serious question as to whether there is adequate water pressure in the

area to provide sufficient water to the higher floors of the hotel in the event of a fire.  The ROD fails to

address these concerns, noting only that the OIN's construction was appropriate because it "was a key

aspect of an enterprise that is essential to the self-sufficiency" of the OIN.

185.     The ROD similarly does not address in any serious way the impact of potentially

removing OIN land from application of State and local environmental laws.  In response to comments

that the OIN would not be subject to State and local environmental laws if the subject lands were taken

into trust, the ROD simply notes that "[t]he Federal government supports tribal self-determination."  The

ROD additionally notes that the OIN presently voluntarily complies with certain environmental standards

without describing the Secretary's reason, if any, for believing that the OIN would continue abiding by

such standards following the subject lands being taken into trust.

186.     Accordingly, the Determination is arbitrary and capricious, an abuse of discretion, and

otherwise not in accordance with law.

## TENTH CAUSE OF ACTION

## THE DETERMINATION WAS MADE WITHOUT REGARD TO 25 C.F.R. § 151.10(g)

187.     Repeat and reallege the allegations of paragraphs 1 to 186 as if fully set forth herein.

41

188.     Assuming *arguendo* that Section 151.10 applies to the review of the OIN's application, 25 C.F.R § 151.10(g) directs the Secretary to consider whether the BIA is equipped to discharge the additional responsibilities resulting from the acquisition of the land-in-trust status.

189.     While the Secretary acknowledges in the ROD that the DOI has historically had difficulty administering trust lands, the ROD discusses the issue for less than one page and concludes, disingenuously, that management will not be a problem with respect to the subject lands.

190.     The primary justification for such conclusion is that the Determination will "impose limited additional responsibilities on the BIA" as the property is being acquired for the purpose of providing the OIN with "sovereign authority over its reacquired lands."

191.     This assertion is, of course, entirely inconsistent with both the express and implied assertions throughout the ROD that DOI management of the subject lands will somehow mitigate the problems that taking the subject lands out of the Plaintiffs' jurisdiction will cause the affected communities.

192.     The Determination was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law because the BIA is clearly ill-equipped to discharge properly the responsibilities inherent in acquiring over 13,000 non-contiguous acres in Central New York.   The Eastern Regional Office of the BIA, located in Nashville, TN, is approximately 800 miles away from Central New York.  The ROD does not address whether or how the BIA will discharge its responsibility to administer and superintend OIN trust lands in Central New York.

## ELEVENTH CAUSE OF ACTION

## THE DETERMINATION FAILED TO TAKE INTO ACCOUNT EXISTING EASEMENTS AND LEASES AND RIGHTS OF WAY

193.    Repeat and reallege the allegations of paragraphs 1 to 192 as if fully set forth herein.

194.    The ROD states that "[p]lacement of the [OIN's] lands into trust will not affect any valid existing rights-of-way."

195.    While this conclusory statement of law may be technically accurate it ignores the reality that the OIN has interfered with existing utility easements and also ignores the fact that the Determination does not require the OIN to waive its sovereign immunity with respect to the enforcement of existing easements or rights of way.  As a result, it will be difficult or impossible for holders of easements or rights of way over the subject lands to enforce such easements or rights of way.

196.    The inability to enforce utility easements and rights of way on the subject lands has created major public safety hazards in the past.  For example, upon information and belief and as clearly discussed in comments from National Grid Corporation, in the fall of 2005, the OIN refused to grant the utility company National Grid access to a major natural gas pipeline that runs under an OIN-owned golf course until after conclusion of the golfing season.  The OIN refused to grant access to such pipeline despite the existence of a valid easement and the fact that the utility company had determined, through remote inspection, that the pipeline was damaged.  When National Grid was finally granted access to the pipeline in December 2005, it determined that the pipeline had been damaged by the OIN during the grading of its golf course or installation of a golf course drainage pipe.  The Determination ignored the twin uncontroverted facts that the OIN failed to honor the easement rights of National Grid,

43

and it failed to comply with New York's "Dig Safely" Program, designed to ensure that before any

excavation is undertaken, underground utilities (such as pipelines) are marked out and not ruptured.

197.    Similarly, without prior notice to National Grid, the OIN built a Heli-Pad and associated

drainage installations in a location that encroached on one of National Grid's natural gas pipeline rights

of way.  Such construction was done without regard for National Grid's right of way or the danger of

landing multi-ton helicopters in close proximity to a natural gas pipeline.

198.    Upon information and belief, the OIN interfered with a City of Oneida water main that

crosses several OIN parcels within a pre-existing, lawful 50 foot right-of-way.  To protect water mains,

New York State law requires prior notification to the water main operator by means of a one-call

notification system of proposed excavation near a water main.  The OIN has failed to notify the City of

Oneida of OIN actions that would restrict City access to the water main for maintenance and that would

subject the water main to possible damage. On one occasion the OIN threatened to excavate and cut

off the water main; on another occasion OIN excavated and planned to place a fence on the water main

right-of-way.

199.    Upon information and belief, the City of Oneida also supplies sewer services to all

properties within the City and maintains sewer line easements on OIN-owned property located in the

City.  To ensure the health and safety of all residents, these easements must be fully protected.  An

unregulated sewer system poses obvious public health and safety concerns.

200.    Despite the ROD's conclusion that the Secretary's action will not alter easements and

rights of way, the reality is that taking land into trust for the OIN will impair those rights in substantial

part in light of the OIN's past posture and the sovereign immunity from suit enjoyed by the OIN and

United States.

201.     The Determination was also arbitrary and capricious, an abuse of discretion, and

exceeded the Secretary's statutory authority because it failed to consider whether the OIN lands may

be subject to existing easements, leases and rights of way or disregarded the existence of such

easements, leases, and rights of way and fails to condition taking of the subject lands into trust upon the

existence of an enforcement mechanism for such easements, leases, and rights of way, such as a waiver

of sovereign immunity by the OIN and the United States.

## TWELFTH CAUSE OF ACTION

## THE DETERMINATION WAS ARBITRARY AND CAPRICIOUS, AN ABUSE OF DISCRETION, AND OTHERWISE NOT IN ACCORDANCE WITH LAW BECAUSE THE OIN HAD NOT SATISFIED OUTSTANDING TAX LIENS, AS REQUIRED BY 25 C.F.R. § 151.13

202.     Repeat and reallege the allegations of paragraphs 1 to 201 as if fully set forth herein.

203.     25 C.F.R. §151.13 mandates that prior to taking land into trust, the Secretary "shall

require elimination" of "liens, encumbrances, or infirmities [that] make title to the land unmarketable."

Further, it is Departmental policy not to accept into trust lands that are encumbered by tax liens.

204.     There are outstanding tax liens on the OIN lands resulting from the OIN's refusal to pay

real property taxes required by Sherrill.  Such taxes are owed by the OIN and the liens relating to those

taxes must be eliminated before the lands are taken into trust.

205.     The ROD states that such tax liens have been "addressed" by the OIN's provision of

letters of credit in favor of the Counties, the terms of which were unilaterally dictated by the OIN.

206.    The letters of credit did not "eliminate[]" the tax liens on the subject lands or make title to the subject lands "[]marketable" as 25 C.F.R. § 151.13 requires prior to the Secretary taking land into trust.

207.    In fact, under New York law tax liens remain on land until the taxes are paid and the existence of such liens renders title unmarketable.

208.    Further, the letters of credit issued in favor of the Counties are highly restrictive and do not in any event come close to guaranteeing the full amount owed by the OIN to the Counties.

209.    For example, an independently conducted 2005 valuation of the 225-acre lot that contains Turning Stone Casino (the "Turning Stone Lot") estimated the value of such lot, as improved, to be $362.55 million.

210.    The Secretary has erroneously determined that the OIN will only be required to provide a letter of credit with respect to taxes due on the Turning Stone Lot based on a valuation of $22.5 million.

211.    Because the Secretary did not require elimination of the tax liens on the subject lands or that the OIN provide marketable title to the subject lands as is mandated by 25 C.F.R. 151.13, the Determination was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.

## THIRTEENTH CAUSE OF ACTION

## THE DETERMINATION WAS ARBITRARY AND CAPRICIOUS, AN ABUSE OF DISCRETION, AND OTHERWISE NOT IN ACCORDANCE WITH LAW BECAUSE THE POTENTIAL ENVIRONMENTAL CONSEQUENCES OF TAKING THE LANDS INTO TRUST WERE IGNORED IN VIOLATION OF THE NATIONAL ENVIRONMENTAL POLICY ACT

212.    Repeat and reallege the allegations of paragraphs 1 to 211 as if fully set forth herein.

213.    The Determination failed to comply with NEPA.

214.    NEPA requires the Secretary to "take a hard look" at the environmental impacts and consequences of taking lands into trust.

215.    The environmental review conducted by the DOI and the Secretary, as reflected in the FEIS issued in February 2008, erroneously and arbitrarily concluded that there would be no direct environmental impacts that would result from the transfer of lands into trust.

216.    The superficial environmental review conducted by the DOI and the Secretary relied on faulty logic and incorrect assumptions to rationalize the Secretary's decision regarding the OIN's trust application, in violation of regulations implementing NEPA, which provide that "[e]nvironmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made."  40 C.F.R. § 1502.2(g).

217.    For example, the purported analyses of alternatives in the FEIS and the ROD rely on four "taxation/jurisdiction scenarios," two of which are: Property Taxes Not Paid and Dispute Continues (PTNP-DC) and Casino Closes and All Enterprises Close (CC-AEC).  FEIS at 2-6 to 2-61; ROD at 13-14.  By accepting the draft EIS and FEIS for publication, BIA endorsed the use of these scenarios.

47

218.    As the Plaintiffs made clear in their comments, the CC-AEC scenario is a false "strawman." Indeed, the ROD itself repeatedly states, without explanation since none is needed, that the "Department disputes" it. Nonetheless, throughout the draft EIS and the FEIS, BIA relied on this scenario as the principal justification for discounting any alternative which would not result in at least 13,000 acres of land being taken into trust. Reliance on assumptions such as these in an EIS renders the EIS invalid and requires a new EIS or, at least, a supplemental EIS which uses rational assumptions and scenarios.

219.    The PTNP-DC scenario is also used throughout the FEIS and the ROD (with no apparent "dispute" by the Department). The PTNP-DC scenario assumes that, despite the decision in Sherrill and the DOI's denial of all or part of the OIN's land-into-trust application (meaning that denied lands would be subject to taxation), the OIN will continue to refuse to pay legally owing taxes. The OIN's past, current and future refusal to pay taxes regardless of decisions of the Supreme Court and the DOI was an accepted factor in evaluating the impacts of any alternatives other than those which granted the OIN's request in its entirety. Reliance on the future illegality of an applicant's action is patently unreasonable in evaluating the impacts of a proposed action under NEPA.

220.    The PTNP-DC scenario, which is a key part of the analyses in the FEIS and ROD, recognizes that the OIN has not obeyed, does not obey and will not obey laws: a recognition well founded on the OIN's demonstrated violation of  land use, health, safety and environmental laws. Nonetheless, despite the recognition of the OIN's expected refusal to obey laws, the FEIS, as

mitigation, expresses confidence that the OIN will obey federal law and will "consider" but not be bound to, requirements of state and local land use, health, safety and environmental laws.

221.    Further, based on the OIN's incorrect assertion that its property was exempt from state and local regulatory laws, which has now been rejected by the Supreme Court in <u>Sherrill</u>, the OIN has never complied with state or local land use or environmental laws nor, in some cases, federal environmental laws and regulations.

222.    For example, the OIN has recently constructed and commenced operation of a co-generation plant near their Turning Stone Casino without having first obtained the necessary permits and approvals under the Clean Air Act, 42 U.S.C. § 7401, <u>et</u> <u>seq</u>.  The OIN built Turning Stone Casino itself without first obtaining necessary permits and approvals or complying with applicable State and local laws.  Similarly, upon information and belief, the OIN has constructed numerous golf courses without any permits or legally mandated environmental review.

223.    In addition, upon information and belief, the OIN has violated other laws critical to the public welfare including dumping, wetlands, and storm sewer regulations, fire safety and building codes, and laws regulating the storage of gasoline.

224.    Upon information and belief, based on past and ongoing rapid development of land by the OIN it is reasonably foreseeable that there will be continued development thereon.  The suggestion that the transfer of the land into trust will not result in any changes entirely ignores this reality.

225.    The record before the DOI and the Secretary shows that the transfer of lands into trust will have direct and significant adverse environmental impacts.

226.    The conclusion of DOI and the Secretary arbitrarily and capriciously ignored the demonstrated significant adverse environmental impacts of taking lands into trust in the record before them.

227.    The Determination failed to consider proper alternatives that would mitigate environmental impacts and consequences, as required by NEPA.

228.    Accordingly, the Determination was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.

**FOURTEENTH CAUSE OF ACTION**

**THE DOI FAILED TO CONSIDER CUMULATIVE IMPACTS OF THE TRANSFER AS REQUIRED BY THE NATIONAL ENVIRONMENTAL POLICY ACT**

229.    Repeat and reallege the allegations of paragraphs 1 to 228 as if fully set forth herein.

230.    The ROD states that "[b]ecause the [OIN] is proposing no change in land use or ground-disturbing activity as part of the Proposed Action, resource categories related to the physical environment (e.g., soils, groundwater, air, noise, wildlife, vegetation, wetlands, etc.) would not be subjected to unavoidable adverse impacts as a result of implementing the Proposed Action or one of the alternatives."  In reaching this conclusion, BIA violated the express requirements of NEPA.

231.    NEPA implementing regulations expressly require that an agency consider the direct and indirect effects of its action as well as the cumulative impacts of the action "when added to other past, present and reasonably foreseeable future actions [of any agency or person]."  40 C.F.R. §§1508.7; 1508.8; 1508.25(c).

232.   The ROD improperly relies on the inaccurate conclusions of the FEIS that "there have not been significant adverse effects on environmental resources" as a result of OIN's past management of its lands without compliance with state – and, in some cases, federal – environmental requirements. In fact, the Plaintiffs have documented significant potential and actual adverse effects of such noncompliance on both OIN and non-OIN lands as a result of the OIN's noncompliance with state laws governing, *inter alia*, protection of wetlands, groundwater and surface waters and wildlife, air emissions, solid and hazardous waste regulation, and petroleum bulk storage and spill response.  Among the known instances of OIN noncompliance resulting in adverse environmental effects are:

· Construction and operation of a major air pollution source with the potential to emit more than 150 tons per year of nitrogen oxide, without the required state and/or federal permit that would allow for monitoring of emissions that directly impact air quality on non-OIN lands, including the nearby Vernon-Verona-Sherrill Central School District campus.

· Construction activities related to the development of Turning Stone Casino causing permanent destruction or impairment of state and federal jurisdictional wetlands and consequential impairment of adjacent wetlands, ground and surface waters and wildlife  habitat, on both OIN and non-OIN lands.

· The OIN practice of building demolition and burial of debris on-site without regard to appropriate disposal practices, posing a direct threat of contamination of groundwater on both OIN and non-OIN lands.

· The OIN's operation of numerous gas stations without the stringent oversight of state regulations governing the storage of petroleum, and without allowing state access for spill response, which poses a serious and imminent threat to groundwater quality on both OIN and non-OIN lands.

These past actions and others by the OIN resulting in adverse environmental impacts were required by NEPA to be considered by the DOI on a cumulative basis with the current transfer of land and change of jurisdiction.

233.    In addition, the DOI completely failed to consider the foreseeable future actions by the OIN that must also be considered on a cumulative basis with the transfer of title.  The DOI improperly accepts at face value the OIN's representations that there will be no change in the use of the land after transfer.  To the contrary, the OIN has repeatedly expressed its intentions to continue to expand and diversify its economic activity, and these future actions on lands taken into trust will foreseeably result in environmental impacts on both OIN and non-OIN lands that NEPA requires the agency to consider.

234.    Accordingly, the Determination was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.

## FIFTEENTH CAUSE OF ACTION

## THE DOI VIOLATED FOIA AND 43 C.F.R. PART 2

235.    Repeat and reallege the allegations of paragraphs 1 to 234 as if fully set forth herein.

236.    As set forth in paragraphs 64 to 71 above, Plaintiffs requested under FOIA access to all documents and evidence submitted in regard to the OIN's land in trust application.

237.    The requested documentation contained the evidentiary basis upon which the DOI would render the Determination.

238.    The ability of the Plaintiffs to exercise their constitutional rights to have notice and be heard relative to the OIN's land-into-trust application, required open and fair access to the documents submitted by the OIN in support of its application, which were reviewed and apparently accepted uncritically by the DOI in issuing the Determination.

239.    Under FOIA, the DOI ordinarily is allowed 20 workdays from the date of receipt of a
FOIA request to determine whether to grant or deny the FOIA request but is allowed to take an
additional 10 workdays to collect and examine voluminous requests.

240.    More than 19 months after the initial FOIA request was submitted by Plaintiffs, Plaintiffs
have yet to receive the requested FOIA documents.

241.    As of the date of this Complaint, the DOI has been in receipt of a check in the amount
of $9,540, DOI's estimated cost for the full production of the documents responsive to the FOIA
request, for over fourteen months.

242.    In May 2007, the FOIA coordinator for the BIA's Eastern Region Office informed
Plaintiffs that the responsive FOIA documents were under review in the U.S. Solicitor's Office and
would be provided to Plaintiffs in early June.

243.    Thereafter, Plaintiffs had regular, repeated conversations with such FOIA coordinator,
and her subsequent replacement, regarding the status of the document production in response to the
FOIA request and, each time, Plaintiffs were assured that the Solicitor's Office was in the process of
reviewing the documents and Plaintiffs would receive the documents shortly.

244.    In response to Plaintiffs' frequent inquiries as to the status of the response that had
already been paid for, on January 9, 2008 Plaintiffs received a letter from the Acting Director of the
BIA's Eastern Region office informing Plaintiffs that the Solicitor's Office intended to complete its
review by January 25, 2008.

245.     In good faith, Plaintiffs have relied on the DOI's frequent and repeated promises to provide the documents requested.

246.     By withholding these critical documents, Defendants substantially impaired the ability of Plaintiffs to provide meaningful comment on the draft EIS and the FEIS.

247.     Defendants' conduct, by failing to turn over documents necessary to evaluate the land-into-trust application despite repeated requests and promises to do so, left Plaintiffs without a remedy as an administrative appeal would have been futile in that Defendants had continually maintained that all of the responsive documents were going to be produced and Plaintiffs had already paid for the document production.

248.     Defendants' failure to provide Plaintiffs with the responsive documents pursuant to FOIA is a violation of FOIA and the DOI's own regulations.

249.     Defendants' illegal failure to comply with Plaintiffs' requests presents particular problems with respect to the request for copies of Oneida Ordinances and Codes, which Plaintiffs have never had the opportunity to review.  The EIS listed the Oneida Ordinances and Codes in support of DOI's conclusion that the land transfer and accompanying change in regulatory jurisdiction would have no environmental impact, but also expressly refused to provide any comparison between Oneida and New York State regulatory provisions.  Defendants' reliance upon these materials in the Determination, and simultaneous refusal to provide them to Plaintiffs, deprived Plaintiffs of the opportunity to respond meaningfully to DOI's conclusions.

250.     Defendants' acts and omissions in violating FOIA and the DOI's own regulations rise to the level of a constitutional violation inasmuch as that conduct deprived Plaintiffs of documentation and information as to which public access was mandated by law and such public access was necessary for Plaintiffs to exercise their due process rights meaningfully.

## SIXTEENTH CAUSE OF ACTION

## THE DOI FAILED TO DISCLOSE THE DOCUMENTS UNDERLYING THE ENVIRONMENTAL IMPACT STATEMENT AS IS MANDATED BY 40 C.F.R. § 1506.6

251.     Repeat and reallege the allegations of paragraphs 1 to 250 as if fully set forth herein.

252.     NEPA's implementing regulations mandate that any agency preparing an EIS "[m]ake environmental impact statements, the comments received, *and any underlying documents* available to the public pursuant to the provisions of [FOIA], without regard to the exclusion for interagency memoranda…" 40 C.F.R. § 1506.6(f) (emphasis added).

253.     As set forth in paragraphs 235 to 250 above, the DOI has violated FOIA by failing to produce "underlying documents" relevant to the EIS.

254.     The DOI's failure to comply with FOIA, as is mandated by 40 C.F.R. § 1506.6(f), is an independent violation of NEPA's implementing regulations and, further, frustrates the requirement that the Secretary solicit the views of local and state governments affected by a proposed land-into-trust transfer prior to ruling on such a request.  See 42 U.S.C. § 4332(2)(C).

255.   The Determination was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law as the Determination was based on an EIS which was drafted in a manner inconsistent with NEPA and its implementing regulations.

## SEVENTEENTH CAUSE OF ACTION

**THE DETERMINATION EXCEEDED THE SECRETARY'S STATUTORY AUTHORITY AND IS OTHERWISE NOT IN ACCORDANCE WITH LAW BECAUSE IT VIOLATES 25 U.S.C. § 2719(b) IN THAT IT PURPORTS TO TAKE LAND INTO TRUST FOR CLASS III GAMING WITHOUT THE CONSENT OF THE GOVERNOR OF NEW YORK**

256.   Repeat and reallege the allegations of paragraphs 1 to 255 as if fully set forth herein.

257.   The OIN offers casino-type gaming at Turning Stone Casino and clearly intends to continue to offer such gaming at Turning Stone Casino if the subject land is taken into trust.

258.   The land that the Secretary has determined to take into trust includes the land on which Turning Stone Casino is located.

259.   Subject to certain limited exceptions, IGRA prohibits the Secretary from taking land into trust for the purpose of gaming after the October 17, 1988 enactment of the IGRA.  25 U.S.C. § 2719.

260.   The only exception with any conceivable application to the OIN and its Turning Stone Casino requires the Secretary to determine that gaming on the subject land would be "in the best interest of the Indian tribe and its members," "not be detrimental to the surrounding community," and, crucially, requires the Governor of the State in which the gaming activity is to be conducted to concur with such determinations of the Secretary.  25 U.S.C. § 2719(b)(1)(A).

56

261.    DOI guidelines mandate that such determinations regarding the advisability of gaming and efforts to obtain the concurrence of the Governor of the State in which the gaming activity is to be conducted occur independently from the notification process for land into trust applications prescribed by 25 C.F.R. § 151.  See Office of Indian Gaming Management, Checklist for Gaming Acquisitions, Gaming-Related Acquisitions and IGRA Section 20 Determinations, dated March 2005, at 8.

262.    The Secretary has not made the findings mandated by Section 2719(b) nor has he attempted to obtain the concurrence of the Governor of New York with respect to such findings as required by that section.

263.    Instead, the ROD claims that "[t]he casino is situated within the Oneida reservation on Indian lands as required by IGRA" evidently attempting to invoke Section 2719(a) which permits land to be taken into trust for gaming after 1988 if such "…lands are located within or contiguous to the boundaries of the reservation of the Indian tribe on October 17, 1988."  The implication in the ROD – that Turning Stone Casino is located "within or contiguous" to lands that were a reservation of the OIN on October 17, 1988 – is fundamentally at odds with the DOI definition of Indian reservation contained in the regulations governing land into trust applications.  Since the OIN is not recognized as having sovereignty over the casino property that land is not an Indian reservation under the DOI regulations.

264.    As a result, the Secretary's decision to take land to be used by the OIN for casino type gaming is in clear contravention of IGRA and the DOI's own regulations and therefore exceeds the Secretary's statutory authority and is otherwise not in accordance with law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand an order and judgment as follows:

1.      Declaring Defendants' actions in taking the subject lands into trust to be arbitrary and capricious, an abuse of discretion, in excess of the Secretary's statutory authority, unconstitutional, and otherwise not in accordance with law;

2.      Enjoining the Defendants from taking any of the subject lands into trust;

3.      Enjoining the Defendants from taking any of the subject lands into trust that are subject to leases, easements, or rights of way without provision for an effective enforcement mechanism including an appropriate waiver of sovereign immunity by the OIN and the United States;

4.       Enjoining the Defendants from taking any of the subject lands into trust until after fully complying with the National Environmental Policy Act, including the drafting of an Environmental Impact Statement in a manner consistent with the National Environmental Policy Act;

5.      Enjoining the Defendants from taking any of the subject lands into trust until all outstanding tax liens on such lands have been satisfied and the OIN actually tenders marketable title to such lands to the DOI;

6.      Awarding Plaintiffs their costs and disbursements, and;

7.      Granting Plaintiffs such other and further relief as this Court deems just, equitable and proper.

Dated:  June 19, 2008

Respectfully submitted,

Of Counsel:

ANDREW M. CUOMO
*Attorney General of the State of New York, Pro se*
*And as Attorney for the State of New York*
*and Governor David A. Paterson*

WHITE & CASE LLP
Dwight A. Healy
Bar Roll No:  302232
1155 Avenue of the Americas
New York, NY  10036

By:____s/ Robert A. Siegfried_____
    ROBERT A. SIEGFRIED, AAG
    Bar Roll No:  102608
    Tel:      518-473-5097
    E-Mail:    Robert.Siegfried@oag.state.ny.us

    DAVID B. ROBERTS, AAG
    Bar Roll No:  102455
    Tel:      518-408-2516
    E-Mail:    David.Roberts@oag.state.ny.us

    Office of the Attorney General
    The Capitol
    Albany, New York  12224

NIXON PEABODY LLP
*Attorney for Madison County, New York and*
*Oneida County, New York*

By:_____s/ David M. Schraver_____
    DAVID M. SCHRAVER
    Bar Roll No:  105037
    1100 Clinton Square
    Rochester, New York  14604-1792
    Tel:585-263-1000
    E-Mail:    DSchraver@nixonpeabody.com

DAVID H. TENNANT, ESQ.
Bar Roll No: 510527
1100 Clinton Square
Rochester, New York 14604-1792
Tel: 585-263-1000
E-Mail:    DTennant@nixonpeabody.com