UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

STATE OF NEW YORK; ANDREW M. CUOMO,
in his capacity as Governor of the State of New York;
ERIC T. SCHNEIDERMAN, in his capacity as Attorney
General of the State of New York; MADISON
COUNTY, NEW YORK; and ONEIDA COUNTY,
NEW YORK,

                                Plaintiffs,

    – against –

KENNETH L. SALAZAR, Secretary, United States
Department of the Interior, JAMES E. CASON,
Associate Deputy Secretary of the Interior; P. LYNN
SCARLETT, Deputy Secretary of the Interior;
FRANKLIN KEEL, Eastern Regional Director, Bureau
of Indian Affairs; UNITED STATES DEPARTMENT
OF THE INTERIOR, BUREAU OF INDIAN
AFFAIRS; UNITED STATES DEPARTMENT OF THE
INTERIOR; UNITED STATES OF AMERICA;
JAMES A. WILLIAMS, Acting Administrator,
United States General Services Administration;
UNITED STATES GENERAL SERVICES
ADMINISTRATION,

                             Defendants,

    and

ONEIDA NATION OF NEW YORK,

                             Defendant-Intervenor.

_____

Civil Action No.
6:08-CV-00644 (LEK) (DEP)

## STATEMENT OF MATERIAL FACTS

       Plaintiffs State of New York, Andrew M. Cuomo, in his capacity as Governor of the State

of New York, and Eric T. Schneiderman, in his capacity as Attorney General of the State of New

York (the "State") and Madison and Oneida Counties (the "Counties") hereby provide a

Statement of Material Facts pursuant to Local Rule 7.1(a)(3) in support of their Motion for

Summary Judgment.

The City of Sherrill Decision

1.      The lands owned by the Oneida Indian Nation of New York ("OIN") were ceded by the historic Oneida Indian Nation "to the people of the State of New York forever" in 1788. (Second Amended Complaint ("Compl."), Dkt. No. 94, at ¶ 31; Defendants' Answer to Compl. ("Ans."), Dkt. No. 137 at ¶ 31).

2.      Those lands were located within an approximately 250,000-acre area that was transferred to the State by the ancient Oneida tribe in a series of transactions beginning in 1795. (Compl. ¶ 31; Ans. ¶ 31).[1]

3.      Since the 1800s, the area has been populated predominately by non-Indians.  (Compl. ¶ 34; Ans. ¶ 34).

4.      In 1987, the OIN began to purchase on the free market some of the land that the Oneidas had sold to the State.  See Declaration of Aaron M. Baldwin in Support of Plaintiffs' Motion for Summary Judgment dated November 15, 2011 ("Baldwin Decl.") at Exh. A (FEIS at ES-4).

5.      By 2005, the OIN purchased a total of 17,370 acres scattered throughout the Counties.  See id. at Exh. A (FEIS at ES-4).

6.      Prior to March 29, 2005, the OIN took the position that it exercised tribal sovereignty over such land, and the land was immune from state and local tax and regulatory laws.  See id. at Exh. L (ROD at 60).

7.      On March 29, 2005, the Supreme Court issued its decision in City of Sherrill v. Oneida Indian Nation of New York, 544 U.S. 197 (2005).  Id. at Exh. L (ROD at 6).

---

[1]     Capitalized terms not defined herein have the same meaning as prescribed in the Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment.

8.     In <u>Sherrill</u>, the Supreme Court determined that the OIN did not exercise "sovereign authority" over land that it had purchased in fee simple over the previous 20 years, and specifically, that the land was subject to state and local tax and regulatory law.  <u>Id</u>. at Exh. L (ROD at 6).

<u>The OIN Application</u>

9.     On March 31, 2005, representatives from the OIN met with Franklin Keel, Director of the Eastern Regional Office of the Bureau of Indian Affairs ("BIA") to discuss immediate actions to bring the OIN lands into trust and to explore possibilities for avoiding towns taking action to enforce tax and regulatory law under <u>Sherrill</u>.  <u>See id</u>. at Exh. B (PWNR000060).

10.     The OIN requested that the DOI waive the provisions of 25 C.F.R. Part 151.  <u>Id</u>. at Exh. B (PWNR000060).

11.     On April 4, 2005, by letter from OIN Representative Ray Halbritter to Franklin Keel, BIA, the OIN applied to have the Secretary of the Interior (the "Secretary") take approximately 17,370 acres of land into trust for the benefit of the OIN (the "Application").  <u>See id</u>. at Exh. C (AR003473-74).

12.     The Application stated that taking land into trust "will clarify uncertainties existing in the wake of the <u>City of Sherrill</u> decision, is needed to preserve the Nation's sovereignty and its lands . . . and is necessary to facilitate the Nation's self-determination, its economic development and its ability to provide housing, jobs, education and health care for its members."  <u>Id</u>. at Exh. C (AR003474).

13.     Days after submitting the Application, the OIN asked the DOI for assistance to forestall efforts by local governments to enforce jurisdiction over the land.  <u>See id</u>. at Exh. D (Doc #27).

14.     In early September 2005, the DOI instructed the OIN to prioritize its properties because then-Assistant Deputy Secretary James Cason only felt comfortable bringing 10,000 acres into trust at that time.  See id. at Exh. K (Doc #73).

15.     As a result of discussions between the OIN and senior personnel at the DOI, the OIN divided the 17,000 acres into three groupings.  Id. at Exh. K (Doc #73).

16.     The OIN requested, through their lobbyist – former DOJ and DOI official and personal acquaintance of Mr. Cason, Thomas Sansonetti – an accelerated decision on the Application by a special team within the DOI.  See id. at Exh. E (AR083810).

17.     The DOI did not formally notify the Counties, and local governments and agencies of the Application until September 20, 2005.  See id. at Exh. J (AR006454-57).

18.     The September 20, 2005 notification requested information and comments concerning Group 1 and 2 parcels.  Id. at Exh. J (AR006455).

19.     On November 15, 2005, the DOI requested information and comments concerning the Group 3 parcels.  Id. at Exh. PPPP (AR005930-31).

20.     Plaintiffs submitted comments concerning the Groups 1 and 2 parcels on January 30, 2006.  See Baldwin Decl. at Exh. O (AR000280-317 (State Groups 1 & 2); id. at Exh. QQQQ AR001438-1735 (Madison County Group 1); id. at Exh. RRRR (AR004267-4307 (Nixon Peabody letter)).

21.     Plaintiffs submitted comments concerning the Group 3 parcels on February 28, 2006.  See Baldwin Decl. at Exh. P (AR001106-38 (State Group 3)); Exh. QQQ (AR67756-89 (Madison County Group 3)); id. at Exh. SSSS (AR003434-3654 (Oneida County Group 3)).  In its comments, the State noted, among other things, that 25 U.S.C. § 465 does not apply to the OIN, and that there were serious questions regarding whether the OIN was a recognized tribe

under federal jurisdiction in 1934 and thus eligible for lands to be taken into trust under the IRA. <u>See</u> Baldwin Decl. at Exh. O (AR00284-288 (State comments on Groups 1 & 2)); Exh. P (AR001111-14 (State comments on Group 3 parcels)).

22.     In its comments, the State noted, among other things, that 25 U.S.C, § 465 does not apply to the OIN, and that there were serious questions regarding whether the OIN was a recognized tribe under federal jurisdiction in 1934 and thus eligible for lands to be taken into trust under the IRA.  <u>See</u> Baldwin Decl. at Exh. O (AR00284-288 (State comments on Groups 1 & 2 parcels)); <u>id</u>. at Exh. P (AR0011111-14 (State comments on Group 3 parcels)).

23.     The State also informed the DOI that, assuming that 25 U.S.C. § 465 was applicable to the Application, the proper section of the land-into-trust regulations to evaluate the Application was the off-reservation criteria in 25 C.F.R. § 151.11.   <u>See</u> <u>id</u>. at Exh. O (AR000291-94 (State comments on Groups 1 & 2 parcels)); <u>id</u>. at Exh. P (AR001117-19 (State comments on Group 3 parcels)).

<u>The DOI Fails to Produce Documents Under FOIA</u>

24.     The Counties submitted FOIA requests on October 30, 2006, November 20, 2006, July 13, 2007 and September 20, 2007.  The State submitted a FOIA request on January 10, 2007.  (Dkt. No. 140-6.)

25.     The DOI did not complete its production of documents responsive to those requests until June 2011, after an order from this Court, and over three years after the DOI issued the ROD.  <u>See</u> Dkt. Nos. 49, 210.

Statutory Authority For The DOI to Take Land Into Trust

26.     25 U.S.C. § 465 authorizes the Secretary of the Interior to acquire land and hold it in trust "for the purpose of providing land for Indians," and is the statutory authority under which the DOI purported to make the Determination.  Baldwin Decl. at Exh. L (ROD at 6).

27.     25 U.S.C. § 479 defines the term "Indian" to "include all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendents of such members who were, on June 1,1934, residing within the boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood."  Id. at Exh. O (AR00286 n.2); Exh. P.

28.     On February 24, 2009, the Supreme Court held in Carcieri v. Salazar that the IRA provides authority for the DOI to take land into trust only for recognized tribes under federal jurisdiction at the date the IRA was enacted, June 18, 1934.  (Dkt. No. 169 at 34.)

29.     The DOI concluded that the OIN is currently a federally recognized tribe and cited to a list of federally recognized tribes from 2007.  Id. at Exh. L (ROD at 32).

30.     The DOI concluded that it had authority under 25 U.S.C. § 465 to take land into trust for the OIN and that "no statutory limitation on acquiring land in trust is applicable to the Nation's request."  Id. at Exh. L (ROD at 33-34).

31.     In making the Determination, the United States Department of Interior did not consider if the OIN was a recognized tribe under federal jurisdiction on June 18, 1934.  (Dkt. No. 169 at 34-35.)

32.     The DOI did not regard the Oneida Indians in New York to be a tribe or to be under federal jurisdiction in 1934.  Declaration of David H. Tennant in Support of Plaintiffs' Motion for Summary Judgment [Third Cause of Action], dated November 15, 2011 ("Tennant Decl.")

Parts 2 and 3 (¶¶ 14-86) and Exhibits attached thereto; Declaration of Stephen Dow Beckham, dated November 14, 2011, and expert report attached thereto ("Beckham Report"), filed as Exhibit WW to the Baldwin Decl., specifically Beckham Report at 22-59, 67-69.

33.     The Oneida Indians in New York in 1934 were not under the supervision and control of the DOI.  Tennant Decl. ¶¶ 14-86 and Exhibits attached thereto; Beckham Report (Exh. WW to Baldwin Decl.) at 22-59, 67-69.

34.     The Oneida Indians in New York in 1934 were not under the supervision and control of the DOI.  Tennant Decl. ¶¶ 14-86 and Exhibits attached thereto; Beckham Report (Exh. WW to Baldwin Decl.) at 22-59, 67-69.

35.     No lands of the Oneida Indians in New York in 1934 were then under the supervision and control of the United States Department of the Interior.  Tennant Decl. ¶¶ 14-86 and Exhibits attached thereto; Beckham Report (Exh. WW to the Baldwin Decl.) at 22-59, 67-69.

36.     No lands of the Oneida Indians in New York in 1934 were then under the supervision and control of the DOI.  Tennant Decl. ¶¶ 14-86 and Exhibits attached thereto; Beckham Report (Exh. WW to Baldwin Decl.) at 22-59, 67-69.

37.     In 1934, the United States held no land in New York in trust for the Oneida Indians in New York.  ROD at 36; Tennant Decl. ¶¶ 14-86 and Exhibits attached thereto; Beckham Report (Exh. WW to the Baldwin Decl.) at 22-59, 67-69.

38.     By 1914, and continuing until sometime after June 18, 1936, the Oneida Indians in New York were not regarded by the DOI or Office of Indian Affairs as a tribe, the tribe having removed from New York and relocated to Wisconsin and Canada.  Tennant Decl. ¶¶ 14-68 and Exhibits attached thereto; Beckham Report (Exh. WW to Baldwin Decl.) at 22-59, 67-69.

39.     By 1914, and continuing until sometime after June 18, 1936, there was no Oneida tribe in New York.  Tennant Decl. ¶¶ 14-68 and Exhibits attached thereto; Beckham Report (Exh. WW to Baldwin Decl.) at 22-59, 67-69.

40.     From 1900 to June 18, 1936, the DOI and Office of Indian Affairs did not regard the Oneida Indians who resided on the 32-acre parcel in Oneida, New York (Madison County) as a "tribe" or "band."  Tennant Decl. (Part 2) ¶¶ 14-68 and Exhibits attached thereto; Beckham Report (Exh. WW to Baldwin Decl.) at 22-59, 67-69.

41.     In 1982, the DOI regarded the group of Indians who were the subject of the eviction proceeding described in United State v. Boylan, 265 F. 468 (1919), to be an "ad hoc organization" rather than "a traditionally derived tribe or band."  Declaration of David H. Tennant in Support of Plaintiffs' Motion for Summary Judgment dated November 15, 2011 ("Tennant Decl."), at ¶ 67, Exh. UU (1982 DOI memorandum at 5).

42.     In 1934, the 32-acre parcel in Oneida, New York (Madison County), sometimes referred to as the "Oneida Territory," was owned in fee by William Rockwell.  Beckham Report (Exh. WW to Baldwin Decl.) at 5, 21-22, 43-44, 65.

43.     In 1934, the 32-acre parcel in Oneida, New York (Madison County), sometimes referred to as the "Oneida Territory," was occupied by William Rockwell, his third wife, and their son.  Beckham Report (Exh. WW to Baldwin Decl.) at 43-44.

44.     There is no evidence that in 1934, the 32-acre parcel in Oneida, New York (Madison County), sometimes referred to as the "Oneida Territory," was used for any tribal purposes.  Beckham Report (Exh. WW to Baldwin Decl.) at 69.

45.     In the late 19th century and continuing until the middle 20th century, the United States took the position that the Oneidas in New York were under the jurisdiction of the State of

New York.  Tennant Decl. ¶¶ 40-41 and Exhibits UU and VV; and (Part 3) ¶¶ 69-86 and Exhibits attached thereto; Beckham Report (Exh. WW to Baldwin Decl.) at 22-38, 65, 67-69.

46.     In the early 19th century and continuing until at least June 18, 1936, the DOI and Office of Indian Affairs took the position that without specific Congressional action, including direct legislation and appropriations, neither the DOI nor the Office of Indian Affairs could exercise jurisdiction (i.e. supervision and control) over the property and affairs of the Indians in New York, including the Oneidas.  Tennant Decl. ¶ 41, Exh. P. FFF, BBB, CCC; ¶ 80 and Exh. EEE; Beckham Report (Exh. WW to Baldwin Decl.) at 38-41.

47.     The DOI took the position in 1938 that "only" two ways existed for New York Indians to come under the supervision and control of the DOI and Office of Indian Affairs:  (1) "by voluntary action on the part of the Indian" by adopting the Indian Reorganization Act of June 18, 1934 or (2) by Congress passing legislation specifically authorizing the DOI to exercise jurisdiction over New York Indians and their affairs and property in New York.   Tennant Decl. ¶ 80, Exh. EEE.

48.     As of June 18, 1934, Congress had not passed legislation specifically authorizing the DOI or the Office of Indian Affairs to exercise supervision and control over New York Indians. See Tennant Decl. ¶ 80, Exh. EEE.

49.     As of June 18, 1934, Congress had not passed legislation specifically authorizing the DOI or the Office of Indian Affairs to exercise supervision and control over New York Indians. See Tennant Decl. ¶ 80, Exh. EEE.

50.     As of June 18, 1934, Congress had not passed legislation specifically appropriating money for the DOI or the Office of Indian Affairs to exercise supervision and control over New York Indians.  See Tennant Decl. ¶ 80, Exh. EEE.

51.     69 Oneida Indians voted on the IRA referendum on either June 17, 1936 or June 18, 1936.  Tennant Decl. ¶¶ 56-57, Exhs. LL and MM.; Beckham Report at 48-49.

52.     The Oneida Indians in New York rejected the IRA by a vote of 57 to 12.  Tennant Decl. ¶¶ 56-57, Exhs. LL and MM.; Beckham Report at 48-49.

53.     In the early 19th century and continuing until after 1934, the DOI rejected numerous requests for assistance from Oneida Indians in New York, specifically denying the DOI had jurisdiction to intervene on the Indians' behalf.  Tennant Decl. ¶¶ 68-76 and Exhibits attached thereto; Beckham Report (Exh. WW to Baldwin Decl.) at 26-27, 67-68.

54.     In 1934, the only Oneida tribe recognized by the United States was the Oneida Tribe of Indians of Wisconsin.  See generally Tennant Decl. ¶¶ 14-68 and Exhibits attached; see specifically Exhs. QQ and RR.

55.     At least since the middle years of the nineteenth century, most Oneidas have resided elsewhere than in the area that once composed the ancient Oneida tribal entity's historic reservation in New York.  Sherrill, 544 U.S. at 202.

56.     The modern-day OIN, the defendant-intervenor in this action, did not exist in 1934.  Tennant Decl. ¶¶ 65-66, Exh. TT and Exhibits attached thereto; Beckham Report (Exh. WW to the Baldwin Decl.) at 59-64, 69.

57.     The modern-day OIN, the defendant-intervenor in this action, was not organized or recognized by the United States until sometime after 1948.  Tennant Decl. ¶¶ 65-66, Exh. TT; ¶ 67, Exh. UU; Beckham Report (Exh. WW to Baldwin Decl.) at 59-64, 69.

Application of "On-Reservation" Land Into Trust Regulations

58.     The DOI land-into-trust regulations contain two different sets of mandatory considerations, one for "on-reservation" acquisitions and one for "off-reservation" acquisitions.

See 25 C.F.R. § 151.10; 25 C.F.R. § 151.11; Baldwin Decl. at Exh. GG (AR007241-42); id. at Exh. HH (AR049170-71).

59.     Under the off-reservation criteria, "as the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition.  The Secretary shall give greater weight to the concerns" raised by affected governments concerning tax and jurisdictional impacts.  25 C.F.R. § 151.11(b); see Baldwin Decl. at Exh. GG (AR007241-42); id. at Exh. HH (AR049170-71).

60.     The DOI's regulations define "reservation" as "that area of land over which the tribe is recognized by the United States as having governmental jurisdiction . . . or where there has been a final judicial determination that a reservation has been disestablished or diminished, Indian reservation means that area of land constituting the former reservation of the tribe as defined by the Secretary."  25 C.F.R. § 151.2(f); see Baldwin Decl. at Exh. GG (AR007241-42); id. at Exh. HH (AR049170-71).

61.     The DOI found that the OIN lacks tribal sovereignty over the lands as a matter of law. See Baldwin Decl. at Exh. A (FEIS at 1-8).

62.     The DOI concluded that the "Oneida reservation" had not been disestablished or diminished.  See id. at Exh A (FEIS at ES-5).

63.     The DOI evaluated the Application under the on-reservation criteria.  Baldwin Decl. at Exh. L (ROD at 32).

The DOI's Policy to Not Accept Land Into Trust For Tribes Who Can Successfully Manage Their Own Affairs

64.     The DOI's policy on taking land into trust is to "not take additional land in trust for Indians who now have the ability to manage their own affairs."  Baldwin Decl. at Exh. CCC

(4/21/59 Memo); id. at Exh. O (AR00287-88, n.3) (State comments on Group 1 and 2 parcels);

id. at Exh. P (AR001113-14, n.3 (State comments on Group 3 parcels)).

65.    The Commissioner of Indian Affairs stated that when "trust status [would] place [the

applicant] in a position where the trust status is being used as a 'tax dodge' by a 'big operator'"

trust status would be denied. Baldwin Decl. at Exh. DDD (Memorandum dated August 3, 1960

from Commissioner of DOI, BIA to All Area Directors); id. at Exh. O (AR00287-88, n.3 (State

comments on Group 1 and 2 parcels)); id. at Exh. P (AR001113-14, n.3 (State comments on

Group 3 parcels).

66.    The DOI has concluded that the OIN can lawfully operate its businesses, including

the Turning Stone Casino even if the OIN land on which such businesses are located is not taken

into trust.    See Baldwin Decl. at Exh. L (ROD at 12; 39); id. at Exh. SS (ARS004558

(Handwritten Note by James Cason)).

67.    The OIN realizes approximately $400 million in annual income from its enterprises,

approximately $330 million of which is attributable to the Turning Stone Casino and Resort.  Id.

at Exh. VV (ARS000904); id. at Exh. FFF (¶ 49, AR013094); id. at Exh. A (FEIS at 3-279 to 3-

280).

68.    The OIN is financially capable of paying the highest estimated property tax burden of

$16.2 million for all of its lands.  Id. at Exh. FFF (¶¶ 96-99, AR013111-12); id. at Exh. II (Jarrell

Supplemental Report ¶ 72).

69.    The DOI recognized the OIN's success in achieving self-determination and financial

independence.  Id. at Exh. A (FEIS at 3-246).

The DOI's Policy of Obtaining Preliminary Title Opinions ("PTOs")

70.     The DOI's regulations require that "[i]f the Secretary determines that he will approve a request for the acquisition of land from unrestricted fee status to trust status, he shall acquire, or require the applicant to furnish, title evidence meeting the Standards For The Preparation of Title Evidence In Land Acquisitions by the United States." 25 C.F.R. § 151.13; see Baldwin Decl. at Exh. L (ROD at 53).

71.     The OIN land is held in unrestricted fee.   See Baldwin Decl. at Exh. MM (AR005715-17); id. at Exh. L (ROD at 26 (citing cases vacated by Oneida Indian Nation of New York v. Madison County, Nos. 05-6408-cv; 06-5168-cv; 06-5515-cv (2d Cir. Oct. 20, 2011)); see Baldwin Decl. at Exh. OO.

72.     The Standards For The Preparation of Title Evidence In Land Acquisitions by the United States state that "preliminary title evidence will be accepted as a basis for the preparation of preliminary title opinions which contemplate further submission of the matter for final approval of title."  Baldwin Decl., Exh. JJ at 3.

73.     The Bureau of Indian Affairs ("BIA") Fee To Trust Checklist lists steps for the request and receipt of PTOs before a decision letter is mailed.  Baldwin Decl. at Exh. GGG (AR007315).

74.     A document titled "Oneida Nation of New York Fee to Trust Outline" states that "[t]he Office of the Solicitor will prepare a Preliminary Title Opinion regarding the property based on the evidence submitted."  Baldwin Decl. at Exh. HHH (FOIA-045877).

75.     The Oneida Nation Fee-To-Trust Briefing Paper prepared by the Native American Law and Economic Development Center states that a "critical time consuming issue involves the drafting of the Preliminary and Final title Opinions by the Department of the Interior's Office of the Solicitor."  Id. at Exh. III (FOIA-045886).

76.     On April 29, 2005, the BIA Eastern Regional Office requested the DOI Solicitor's Office to issue a PTO for each parcel included in the Application.  Id. at Exh. KK (AR007022).

77.     As of June 14, 2006, the BIA and DOI were continuing the task of procuring PTOs in connection with the Application.  See id. at Exh. LL (AR004981).

78.     The Administrative Record does not contain completed PTOs.  (Dkt. Nos. 99, 170, 171, 193, 200).

79.     The ROD does not explain the reason for the DOI's failure to obtain PTOs.  See generally Baldwin Decl. at Exh. L (ROD at 1 – 73).

The DOI's Failure to Require Elimination of the Tax Liens Before Making the Determination

80.     On June 10, 2005, James Cason, then Associate Deputy Secretary of the DOI, wrote to Ray Halbritter stating "it is Departmental policy not to accept into trust lands that are encumbered by tax liens."  Id. at Exh. MM (AR005716).

81.     On November 23, 2005, Mr. Cason sent letters to State Representatives McHugh and Boehlert informing them that the DOI "typically requires that taxes be paid or an agreement reached between the tax assessor and the applicant before [the DOI] publishes a notice of intent to acquire land in trust."  Id. at Exh. HH (AR049174); id. at Exh. GG (AR007245).

82.     The DOI's land-into-trust regulations require elimination of liens, encumbrances or infirmities that make title to the land unmarketable, prior to final approval.  25 C.F.R. § 151.13.

83.     The DOI accepted letters of credit to the Counties and commitments to obtain replacement and supplemental letters of credit from the OIN instead of requiring elimination of the tax liens.  Id. at Exh L (ROD at 53).

84.     On March 6, 2008, approximately two months before the ROD was issued and after the FEIS was released, the OIN informed the DOI that it planned to obtain letters of credit to

"secure payment" of real property taxes, penalties and interest billed by the Counties.  Id. at Exh. PP (AR060866).

85.     The letters of credit require a number of criteria to be satisfied before the Counties receive payment: a final unreviewable judgment determining that the properties under the letters are not subject to a tax exemption, for a tax assessment that must be determined in state litigation at the conclusion of the state litigation if the federal litigation has reached an unreviewable judgment without assessing the amount of taxes to be owed.  The amount of taxes to be paid must be confirmed in an opinion letter issued by an independent counsel selected by the issuing bank.  Id. at Exh. QQ (AR048514-19, AR048522-23); id. at Exh RR at Exhibit A.

86.     The letters of credit expired on September 30, 2009, and automatically extend for one year terms, but the issuing bank can "elect not to consider this letter of credit extended for any such additional period."  Id. at Exh. QQ (AR048513, AR048521); id. at Exh. RR at 2.

87.     The issuing bank, RBS Citizens, N.A. has had a declining credit rating since 2008. (Dkt. No. 141-3, ¶ 52).

88.     The Counties objected to the letters of credit.  See Baldwin Decl. at Exh. KKK (AR01020-23).

89.     There is no analysis of the letters of credit from the OIN in the Administrative Record other than the Counties' objection.  (Dkt. Nos. 99, 170, 171, 193, 200).

90.     The DOI issued the ROD, a "final decision," on May 20, 2008.  Baldwin Decl. at Exh. L (ROD at 73).

91.     The tax liens have not been eliminated.  See Baldwin Decl. at Exh. OO (Oneida Indian Nation of New York v. Madison County, Nos. 05-6408-cv; 06-5168-cv; 06-5515-cv (2d Cir. Oct. 20, 2011)); id. at Exh. KKK (AR010120-21).

92.     There is no operative court decision that the land is not subject to taxation under State law or that the lands are exempt or otherwise immune from property taxes.

The EIS Process

93.     The DOI entrusted the OIN with the responsibility for recommending a contractor, and on October 12, 2005, the OIN recommended Malcolm Pirnie.  Baldwin Decl. at Exh. Q (AR081034-35).

94.     The DOI accepted the OIN's recommendation and also accepted the OIN's draft Memorandum of Agreement that would govern the relationship between Malcolm Pirnie, the OIN, and the DOI.  Id. at Exh. R (AR081033).

95.     The Memorandum of Agreement contained provisions requiring the BIA to consult with the OIN before designating any entity to act as a cooperating agency during the EIS process and before any changes be made to the scope of work.  Id. at Exh. S (AR080993, AR080995).

96.     On November 1, 2005 and November 7, 2005, Madison and Oneida Counties, respectively, requested cooperating agency status under NEPA.  See id. at Exh. U (AR080973-74); id. at Exh. V (AR080975-76).

97.     The DOI responded on January 4, 2006, when it informed the Counties that it would be most convenient to meet at a public hearing for scoping of the EIS process on January 11, 2006. See id. at Exh. W (AR080964); id. at Exh. X (AR08065).

98.     The Counties were provided with a draft memorandum of understanding with one day's notice and were instructed to sign it as soon as possible as the EIS review process was moving forward. See id. at Exh. Y (AR063311).

99.     The Counties provided comments on the memorandum of understanding on February 7, 2006, but did not hear back from the DOI until March 27, 2006.  Id. at Exh. Y (AR063312).

100.    During this time, the DOI provided OIN lawyers with an opportunity to comment on the memorandum of understanding on March 8, 2006, before it responded to the Counties.  Id. at Exh. Z (ARS00191-200).

The DOI's Reliance On Unrealistic Presumptions

101.    On June 14, 2006, counsel for the OIN sent a letter to Malcolm Pirnie asking Malcolm Pirnie to assess an analysis under which the OIN would suffer loss of lands "en masse . . . [w]hether liquidated by the counties or the Nation" if the OIN lost in tax foreclosure litigation.  Id. at Exh. AA (AR076402).

102.     The DEIS, FEIS, and ROD all incorporated this presumption in a scenario referred to as "Property Taxes Not Paid and Foreclosure" ("PTNP-F").  See id. at Exh A (FEIS at ES-8); id. at Exh. L (ROD at 13).

103.    The DEIS, FEIS, and ROD also included a scenario where no land is taken into trust, the OIN's Turning Stone Casino is declared unlawful, and all OIN business enterprises close. (the "CC-AEC" scenario).  See id. at Exh A (FEIS at ES-8); id. at Exh L. (ROD at 14).

104.    The DOI disputes the CC-AEC scenario. Id. at Exh L (ROD at 17).

105.    The DOI concluded that the OIN's Turning Stone Casino is "now operating lawfully under IGRA."  Id. at Exh L (ROD at 12).

106.    The DEIS, FEIS, and ROD contained another scenario where the OIN would not pay property taxes and continue to dispute State and local jurisdiction (the "PTNP-DC" scenario). See id. at Exh A (FEIS at ES-8); id. at Exh. L (ROD at 14).

107. The DOI evaluated each alternative agency action that would take into trust less than all the amount applied for under the PTNP-F and PTNP-DC scenarios. See id. at Exh. A (FEIS at 2-7 to 2-8, 2-18 to 2-19, 2-21, 2-25, 2-29 to 2-30, 2-33, 2-42 to 43 and 2-50); id. Exh. L (ROD at 23-25).

108. In a number of instances, the DOI assumed that if land was not taken into trust, the OIN would shut down its businesses and terminate its employees. See id. at Exh. A (FEIS at 4-217 to 4-218); id. at Exh. L (ROD at 23-25).

109. The DOI treated benefits of current OIN uses (such as taxes paid by OIN employees) as benefits of taking land into trust. See id. Exh A (FEIS 4-199 to 218); id. at Exh L (ROD at 23-27).

110. Under the PTNP-F and the CC-AEC scenarios, the DOI concluded that no action on the Application would result in the loss of 5,000 jobs and loss of over $100 million in payroll income. Id. at Exh. L (ROD at 24).

111. The viability of OIN enterprises does not depend on trust status. See id. Exh SS (AR004558); id. at Exh. L (ROD at 12, 39); id. Exh. FFF (Jarrell Report at ¶¶ 96-99, AR013111-12).

112. Mr. Cason found the scenario resulting in foreclosure of OIN lands not "realistic." Id. at Exh. TTT at 163-64 (Cason Deposition Trans).

DOI's Consideration of the OIN's Need for Additional Land Under 25 C.F.R. § 151.10(b)

113. The DOI concluded that "no demonstration or finding of need for land in trust status is required where, as here, the land to be acquired is located within or adjacent to the tribe's reservation." Id. at Exh. L (ROD at 34).

114. Nonetheless, the DOI purported to evaluate the OIN's need for the land to be held in trust status. Id. at Exh. L (ROD at 35).

115. Before an EIS was drafted and before the DOI issued formal notice to Plaintiffs and local municipalities and school districts, James Cason told the OIN that he only felt "comfortable" bringing 10,000 acres of land into trust. Id. at Exh. K at 1.

116. The DOI internally referred to the 10,000 acre figure as a "limit" set by, or "direction" from, James Cason. Id. at Exh. G (ARS001065); see id. at Exh WWW.

117. The DOI concluded that there was "no mathematical formula" in determining need based on tribal membership or wealth. Id. at Exh. L (ROD at 35).

118. The OIN has 1,000 tribal members. Id. at Exh. L (ROD at 35).

119. The OIN operates a number of tribal programs and governmental functions without the benefit of land in trust. See id. at Exh. A (FEIS at 3-245; 3-247; 4-382).

120. The DOI concluded that taking land into trust for the OIN was necessary to promote cultural and social expression and political self-determination. Id. at Exh. L (ROD at 8).

121. The amount of land used by the OIN for public and community services, tribal housing, and hunting, fishing, and festivals totals approximately 1,510 acres. See id. at Exh. A (FEIS at 3-11, 3-17).

DOI's Evaluation of Removing Land from Tax Rolls Under 25 C.F.R. § 151.10(e)

122. Prior to the drafting of the draft EIS, the DOI informed Malcolm Pirnie that "the tax issue is not necessarily a valid issue but fear was widely spread." Id. at Exh. DD (ARS005040).

123. The DOI informed the OIN that it believed that reduction of local property taxes "is not an impact of the decision . . . and will not result in a valid reduction in annual budgets of the local governments." Id. at Exh. VVV (AR010040-41).

124.    The DOI concluded that that the Determination would result in a positive "net contribution" to the State and its subdivisions, even accounting for lost tax revenue, and that the OIN's "contributions" would "more than offset" the annual loss of property tax revenue. Id. at Exh. L (ROD at 22, 48-49); id. at Exh. A (FEIS at App. M, p. 12).

125.    In evaluating the tax impact of the Determination to local governments, the DOI assumed that the OIN would continue to pay local governments for services provided after its land is taken into trust.  Id. at Exh. L (ROD at 47).

126.    The OIN characterized these payments as "grants" "gifts" and "donations."  Id. at Exh. A (FEIS App. J) (Letter from OIN Representative Ray Halbritter to James Cason, Associate Deputy Secretary of the Interior (Jan. 7, 2008)).

127.    The ROD cites an agreement between the Verona Fire Department and the OIN.  Id. at Exh. L (ROD at 58).  In 2004, the OIN unilaterally changed the formula under which it made payments to the Verona Volunteer Fire Department under the agreement.  See id. at Exh. ZZZ (AR003017).

128.    In 2003, the OIN withheld its "Silver Covenant" payments from the Stockbridge Valley Central School District because the district refused to fire a teaching assistant whom the OIN did not like.  See id. Exh. AAAA (¶ 13, AR004092); id. at Exh. BBBB (¶ 6, AR004099).

129.    Although the ROD states that the OIN has made payments to local governments of $38.5 million since 1995, $10.1 million of that amount was used for capital improvements to service OIN properties, not to pay for services rendered to the tribe.  Id. Exh. FFF (Jarrell Report at ¶ 115, AR013120 & Ex. 19, AR013235).

130.    In calculating the amount of property tax loss, the DOI used an assessment of $22.55 million for the tax lot where the Turning Stone Casino and Resort sits.  Id. Exh. L (ROD at 53).

131.    The $22.55 million assessment does not account for a $340 million assessment of improvements to the land, including improvements such as hotels, golf courses, restaurants, retail shops, event center and conference center.  See id. Exh. L (ROD at 51-53); id. at Exh. CCCC (AR048952).

132.    In its calculations arriving at the positive net contribution conclusion, the DOI counted payments to the State Racing and Wagering Board and State Police under the terms Nation-State Gaming Compact and income, sales, and property taxes paid by OIN employees, plus taxes from a multiplier effect.  Id. at Exh. A (FEIS 4-210).

133.    If the OIN payments under the Nation-State Gaming Compact, the taxes paid by OIN employees, and the taxes from a multiplier effect are not added to the OIN's "contributions," the Determination results in a negative impact to the State and its subdivisions – regardless of which valuation is used for the casino tax lot.  See id. at Exh. A (FEIS at App. E, Tables 18 & 26).

134.    That negative impact is approximately $1,638,800 without including the casino tax lot and $13,839,100 using the $362.55 million assessment for the casino tax lot.  See id. at Exh. A (FEIS at App. E, Tables 18 & 26).

The DOI's Consideration of Potential Jurisdictional Problems Under 25 C.F.R. § 151.10(f)

135.    Before any EIS was drafted, DOI advised Malcolm Pirnie that "[s]tate jurisdictional issues should not be considered substantial reasons to deny the fee-to-trust transfer."  Id. at Exh. DD (ARS005038).

136.    The DOI informed Malcolm Pirnie that "[t]he objections received from local and state authorities over the loss of jurisdiction are considered to be a control issue, rather than a means of environmental preservation . . . ."  Id. at Exh. DD (ARS005038).

137.    The DOI concluded that there will be no adverse effects to environmental resources after the Determination because federal environmental, health and safety laws will apply.  Id. at Exh. L (ROD at 61-65, 67).

138.    State environmental law regulating air quality is stricter than federal law.  See id. at Exh. A (FEIS at 3-77 to 3-79).

139.    State law regarding the conservation of wetlands includes a protective "buffer" area of 100-feet surrounding the wetlands, which the federal Clean Water Act does not.  Id. at Exh. A (FEIS at 3-62 to 3-64).

140.    State protections on drinking water are more stringent than federal regulations.  Id. at Exh. RRR (AR000264).

141.    The OIN constructed a cogeneration plant without the requisite state and federal permits.  Id. Exh. PPP (O'Brien & Gere at 19-20 (AR001162-63)).

142.    The cogeneration plant qualifies as a major source of air emissions.  Id. at Exh. PPP (O'Brien & Gere Report at 19-20(AR001162-63)).

143.    The OIN constructed its Turning Stone Casino and Resort without permits or approvals under applicable State and local law.   Id. at Exh SSS (O'Brien & Gere Report (Group 1) at 12, 36-37 (AR000334, AR000358-59)).

144.    The OIN's Atunyote golf course encroaches on land considered wetlands by the NYSDEC, but not considered wetlands under the federal standard.  Id. at Exh. SSS (O'Brien & Gere Report (Group 1) at 14 (AR000336)).

145.    The DOI refused to substantively consider the OIN's non-conformance with State and local law because it believed that the OIN exercised sovereignty over the land before Sherrill,

and the State would not exercise jurisdiction after lands are taken into trust.  Id. at Exh. AAA (AR0027066); id. at Exh. L (ROD at 60-61).

146.    With regard to the OIN's non-conformance with local zoning laws, the DOI concluded that when "lands [are] placed into trust, local zoning will not apply, and hence, there will be no non-conformity with local zoning among these Nation lands."  Id. at Exh. L (ROD at 60).

147.    The DOI concluded that there would be no environmental, health, or safety impact that would result from the Determination because "the Nation proposes no change in land use as part of its fee-to-trust request."  Id. at Exh. L (ROD at 67).

148.    The OIN has changed the use of more than three-fourths (13,168 acres) of its total land holdings (17,370 acres).  See id. at Exh. A (FEIS at 4-40).

149.    The OIN failed to notify the City of Oneida (the "City") of OIN actions that would restrict the City's access to its water main line on a 50-foot right-of-way on OIN property.  See id. at Exh. HHHH (AR044980); id. at Exh. IIII (AR005700-01); id. at Exh. JJJJ (AR005539).

150.    The OIN threatened to excavate and cut off a water main located in the highway right-of-way on West Road.  Id. at Exh. HHHH (AR044980), id. at Exh. IIII (AR005700-01), id. at Exh. JJJJ (AR005539).

151.    On a separate occasion, the OIN excavated and planned the placement of a fence on the City's water main right-of-way.  Id. at Exh. HHHH (AR044980), id. at Exh. IIII (AR005700-01), id. at Exh. JJJJ (AR005539).

152.    The City notified the DOI of these incidents on January 23, 2006, January 30, 2006, and March 1, 2006.  Id. at Exh. HHHH (AR044976-87), id. at Exh. IIII (AR005693-709), id. at Exh. JJJJ (AR005531-47).

153.    The DOI concluded that the OIN "intends" for all rights of way to remain in effect after the Determination.  Id. at Exh. L (ROD at 66).

The DOI's Consideration of the BIA's Ability to Discharge Additional Responsibilities Resulting From the Determination Under 25 C.F.R. § 151.10(g)

154.    The DOI has had "difficulties" in its administration of Indian trust assets.  Id. at Exh. L (ROD at 69).

155.    If the lands are taken into trust, the DOI/BIA must provide assistance programs and technical assistance whenever a tribe may need it to meet federal environmental regulations.  See id. at Exh. DD (ARS005038).

156.    Since the Supreme Court's Sherrill decision, the OIN has accepted all of its eligible TPA funds from the BIA to support tribal government functions.  Id. at Exh. A (FEIS at 3-248).

157.    Some of the Subject Lands will be used for new commercial uses.  See id. at Exh. L (ROD at 39).

158.    The Eastern Regional Office of the BIA is located in Nashville, TN, approximately 800 miles away from the Subject Lands.  (Compl. ¶ 231; Ans. ¶ 231).

159.    It took the BIA six and a half years to acknowledge receipt of administrative custody and accountability of an 18-acre parcel of land that comprised part of the former U.S. Air Force Base in Verona, New York on behalf of the OIN.  (Dkt. Nos. 72, 111-8.)

The OIN's Ability to Apply for Additional Lands to Be Taken Into Trust

160.    The Determination does not disqualify the OIN from submitting additional land-into-trust applications for the remainder of its 17,370 acres or other lands in the future.  Baldwin Decl. at Exh. L (ROD at 39).

161.    The DOI planned to write the EIS to "leave it open to bring those other properties into trust at a later date after the land claims are resolved."  Id. at Exh. G (ARS001065)

162.   DOI personnel believed that the OIN could request more trust land in a new application, and considered that a "considerable consolation" for not taking all of the OIN's lands into trust under this Application.  Id. at Exh. VV (ARS000905).

163.   The DOI believed that the OIN would file additional applications.  Id. at Exh. VV (ARS000905).

Dated: November 15, 2011

Of Counsel:

WHITE & CASE LLP

Dwight A. Healy, Esq.
Bar Roll No: 302232
1155 Avenue of the Americas
New York, New York  10036-2787
Tel:     212-819-8200
Fax:    212-354-8113

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York,
Pro Se and as Attorney for the State of New
York and Governor Andrew M. Cuomo

By: /s/ Aaron M. Baldwin_____
        AARON M. BALDWIN, AAG
        Bar Roll No:  510175
        Tel:  518-473-6045
        Fax:   518-473-1572 (not for service)
        E-Mail:  Aaron.Baldwin@ag.ny.gov

        Office of the Attorney General
        The Capitol
        Albany, New York  12224

NIXON PEABODY LLP
Attorney for Madison County, New York and
Oneida County, New York

By:/s/ David M. Schraver_____
        DAVID M. SCHRAVER
        Bar Roll No:  105037
        1100 Clinton Square
        Rochester, NY  14604-1792
        Tel:  585-263-1000
        E-Mail:  DSchraver@nixonpeabody.com

        DAVID H. TENNANT, ESQ.
        Bar Roll No:  510527
        1100 Clinton Square
        Rochester, NY  14604-1792
        Tel:  585-263-1000
         E-Mail: DTennant@nixonpeabody.com